Arnold L. **KUPETZ**, Trustee,
Plaintiff-Appellant,

v.

Morris A. **WOLF**, Raviel Wolf, The
Marmon Group, Incorporated,
Defendants–Appellees.

No. 86–6641.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 9, 1987.

Decided April 27, 1988.

Leo D. Plotkin, Levy & Norminton, Los Angeles, Cal., for plaintiff-appellant.

Robert Louis Fisher, Barton, Klugman & Oetting, Los Angeles, Cal., for defendants-appellees Morris A. Wolf and Raviel Wolf.

Robert B. Flaig, Thelen, Marrin, Johnson & Bridges, Los Angeles, Cal., for defendant-appellee The Mormon Group, Inc.

Before SNEED, PREGERSON and KOZINSKI, Circuit Judges.

SNEED, Circuit Judge:

The district court, by way of a summary judgment and directed verdict, determined that the bankrupt made neither fraudulent conveyances under various California fraudulent conveyance statutes and section 548 of the Bankruptcy Code nor improper corporate distributions under California law. 77 B.R. 754. The Trustee in bankruptcy appeals these determinations. We affirm.

## I.

### FACTS AND PROCEEDINGS BELOW

Wolf & Vine, a mannequin manufacturing company, is the debtor inproceedings before the United States Bankruptcy Court for the Central District of California. Prior to July 31, 1979, Wolf & Vine had been owned 50% by Morris Wolf and 50% by the Marmon Group, Inc. (Marmon). Wolf announced his intention to retire and dispose of his share in the business. Marmon, being obligated under an earlier agreement to purchase the business, began looking for a suitable purchaser of the entire business. After reviewing several potential buyers they decided that David Adashek, an individual backed by Continental Illinois National Bank (the Bank), was suitable.

On July 31, 1979, a series of transactions took place that essentially left Adashek in full control of the company. These transactions amounted to what is known as a leveraged buyout (LBO). There was no evidence in the proceedings below that either Marmon or Wolf knew how the purchase of their stock was to be financed.

The separate transactions were as follows:

(1) Adashek formed Little Red Riding Hood (Riding Hood), a Wisconsin corporation having $100.00 in capital;

(2) Riding Hood purchased all the shares of Wolf & Vine from Wolf and Marmon for $3 million, $1.1 million paid immediately and $1.9 million to be paid in installments over the next two years;

(3) Riding Hood financed the transaction with a $1.1 million loan from the Bank and the Bank issued letters of credit in favor of the sellers for the remaining amount;

(4) Riding Hood merged into Wolf & Vine, which, as the survivor corporation, assumed the obligation of Riding Hood to the sellers, Wolf and Marmon; and

(5) Wolf & Vine pledged its assets to the Bank to secure the $1.1 million loan and the letters of credit. Thus, Adashek effectively pledged the assets of Wolf & Vine to finance his acquisition of that corporation.

All would be well if only Wolf & Vine could service its debt. Adashek, presumably aware of this fact, proceeded to make significant changes in the way the company was run. Apparently Wolf, who had been retained as president, disagreed with some of the changes and several months later resigned. For a time Wolf & Vine made payments to Mr. Wolf and Marmon pursuant to the purchase agreement. For example, in July 1980, Wolf was paid $401,235.75 and Marmon was paid $142,427.32. A year later, however, in July 1981, although Wolf and Marmon were each paid $798,750, the payment to Wolf was made by the Bank under the letter of credit.[1] During this time Wolf & Vine failed to perform as well as Adashek had anticipated and in December 1981 it filed for bankruptcy under Chapter 11. It later changed its petition to a Chapter 7 liquidation proceeding.

In May 1983, the Trustee filed a complaint in the district court alleging that the manner in which the sale was financed constituted fraudulent conveyances to Wolf and Marmon under state law and bankruptcy law, improper distributions to shareholders, breaches of fiduciary duty, and civil conspiracy. The Trustee argues that Wolf and Marmon were the beneficiaries of fraudulent conveyances in the form of payments of the purchase price that left the company's creditors without a chance of collecting the amounts owed to them. The Trustee's claims against Adashek and the Bank were settled leaving only Wolf and Marmon as defendants.

On a summary judgment motion by Wolf and Marmon, the district court decided that there was no creditor whose claim was in existence on the date of the sale, July 31, 1979. For this reason the court granted the defendants' motion for summary judgment on three claims now on appeal. First, it entered judgment against the Trustee's claim that the selling shareholders had received fraudulent conveyances under section four of the Uniform Fraudulent Conveyance Act (UFCA), Cal.Civ.Code § 3439.04 (West 1970), which prohibits transfers lacking fair consideration when the transferee is left insolvent. Second, it rejected the Trustee's claim that the payments to the selling shareholders violated California corporate statutes prohibiting distributions to shareholders when the corporation is as a result not left with enough retained earnings. Cal.Corp.Code § 500 (West 1977 & Supp.1988). Third, it granted summary judgment on the claim that the selling shareholders received distributions prohibited because the company was not left with enough money to meet its liabilities as they matured. Cal.Corp.Code § 501 (West 1977).

The case proceeded to a jury trial. After the Trustee presented his case, the district court directed a verdict in favor of the selling shareholders on the remaining claims, including two now on appeal. First, a verdict was directed on the claim that the selling shareholders received fraudulent conveyances under section five of the UFCA, Cal.Civ.Code § 3439.05 (West 1970),

---

**1.** Apparently, there is some confusion about whether the 1981 payment to Marmon was also under a letter of credit.

prohibiting transfers without fair consideration when the transferee has or is thereby left with unreasonably small capital. Second, a verdict was directed on a claim that the July 1981 payments to the selling shareholders were fraudulent transfers under Bankruptcy Code section 548(a) (2)(A) and (B)(ii). The Trustee now appeals both the summary judgment decisions and the directed verdict on the claims listed above.

## II.

## JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1334 (1982 & Supp. II 1984). The summary judgment and directed verdict are final orders of the district court. This court therefore has jurisdiction under 28 U.S.C. § 1291 (1982).

## III.

## STANDARD OF REVIEW

The grant of summary judgment is reviewed *de novo. Darring v. Kincheloe,* 783 F.2d 874, 876 (9th Cir.1986). This court's review is governed by the same standard as was the district court's. *Ashton v. Cory,* 780 F.2d 816, 818 (9th Cir.1986). The directed verdict is reviewed under the same standard. *Blanton v. Mobil Oil Corp.,* 721 F.2d 1207, 1219 (9th Cir.1983), *cert. denied,* 471 U.S. 1007, 105 S.Ct. 1874, 85 L.Ed.2d 166 (1985). "A directed verdict is proper when the evidence permits only one reasonable conclusion as to the verdict." *Peterson v. Kennedy,* 771 F.2d 1244, 1256 (9th Cir.1985), *cert. denied,* 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986).

## IV.

## DISCUSSION

### A.  *Trustee's Claims*

The Trustee makes three primary claims on appeal, two based on state law and one

on federal law. First, he argues that the payments to the selling shareholders are subject to attack under the state fraudulent conveyance law. Section 544(b) of the Bankruptcy Code permits the Trustee to stand in the shoes of a creditor to assert any state law claims that a creditor may have.[2] Second, the Trustee argues that the 1981 payments were fraudulent transfers under Bankruptcy Code section 548. That section in part prohibits transfers by the debtor made without fair consideration when the debtor is left insolvent or with unreasonably small capital. Inasmuch as the purpose of California fraudulent conveyance law in no way differs from that of Bankruptcy Code § 548,[3] the discussion applicable to the first disposes of claims under the latter as well. Third, it is contended by the Trustee that the payments to the selling shareholders were improper distributions under Cal.Corp.Code §§ 500 and 501, which prohibit payments made when the corporation does not have enough retained earnings, or is unable to meet its liabilities, at the time of, or as a result of, the transaction. For reasons discussed below, we find that none of these claims has merit.

### B.  *The LBO as a Fraudulent Conveyance*

#### 1.  *Background*

LBOs pose difficult issues when the purchased corporation becomes bankrupt. An LBO is a purchase transaction based on pledging the assets of the purchased entity to secure the purchase price. Typically, a small group of investors and managers combine to purchase the outstanding shares of a company by creating a large debt by either issuing high-yield "junk bonds" or obtaining a loan from a financial institution. Almost no equity capital is in-

---

**2.**  The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b) (1982).

**3.**  *See Coder v. Arts,* 213 U.S. 223, 241–44 (1909); 4 L. King, *Collier on Bankruptcy* ¶ 548.01[1] (15th ed. 1988).

vested. The debt, to repeat, is secured by pledging the assets of the acquired company as security.

Existing unsecured creditors are vulnerable in an LBO. From their perspective, a pledge of the company's assets as collateral to finance the purchase of the company reduces the assets to which they can look for repayment. As some of the acquired companies have failed, creditors have begun to assert that LBOs are fraudulent as to creditors.[4] In this case, the Trustee's attack is, at bottom, such an assertion.

The present law of fraudulent conveyances has its roots in the Statute of 13 Elizabeth passed by Parliament in 1571. The statute was directed at a practice by which debtors sold their property to friends or relatives for a nominal sum, thus defeating creditors' attempts to satisfy their claims against the debtor. Once the creditor had given up its claim against the debtor, the debtor would reclaim the property that purportedly had been transferred.

The basic thrust of that early statute was to prohibit transfers that hinder, delay, or defraud creditors. Such transfers were prevented by making the collusive trans-

feree liable to the creditor in the amount of the transfer. For four centuries, the primary difficulty has been how to decide which transfers in fact hinder, delay, or defraud creditors. Because intent to defraud is difficult to prove, courts rely on "badges of fraud." Thus, certain indicia of fraud may lead to the conclusion that the debtor had fraudulent intent. The most common of these, now found in the UFCA and in Bankruptcy Code section 548, is to assume fraudulent intent when an *insolvent debtor makes a transfer and gets nothing or very little in return.*

■ In an LBO, the lender, by taking a security interest in the company's assets, reduces the assets available to creditors in the event of failure of the business.[5] The form of the LBO, while not unimportant, does not alter this reality.[6] Thus, where the parties in an LBO fully intend to hinder the general creditors and benefit the selling shareholders the conveyance is fraudulent under UFCA § 7.[7] The per se rules of the UFCA also may apply. A transfer made by an insolvent debtor who does not receive *fair* consideration is a fraudulent conveyance.[8] And if a transaction leaves

---

4. Business lawyers and academic commentators have taken note of the potential liability to creditors of selling shareholders and lending institutions in LBO transactions. *See* Baird & Jackson, *Fraudulent Conveyance Law and Its Proper Domain*, 38 Vand.L.Rev. 829, 851 (1985); Murdoch, Sartin, & Zadek, *Leveraged Buyouts and Fraudulent Transfers: Life After Gleneagles*, 43 Bus.Law. 1 (1987); Kirby, McGuinness, & Kandel, *Fraudulent Conveyance Concerns in Leveraged Buyout Lending*, 43 Bus.Law. 27 (1987); Note, *Fraudulent Conveyance Law and Leveraged Buyouts*, 87 Colum.L.Rev. 1491 (1987).

5. Professors Baird and Jackson point out in *Fraudulent Conveyance Law and Its Proper Domain*, 38 Vand.L.Rev. 829, 851 (1985) that "[e]ven under the narrowest view of fraudulent conveyance law, the leveraged buyout may be a fraudulent conveyance."

6. *See United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1302 (3d Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987). As Baird and Jackson note, courts "typically have had no difficulty construing such a segmented transaction as one deal. Courts will not allow the labels that interested parties place

on their own transactions to control the rights of third parties." Baird & Jackson, *supra*, at 851.

7. Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.
Cal.Civ.Code § 3439.07 (West 1970). In this opinion, references to the UFCA are to be taken as reference to the California version of the UFCA.
In 1986, the California legislature replaced the UFCA with the Uniform Fraudulent Transfer Act (UFTA). Cal.Civ.Code §§ 3439–3439.12 (West Supp.1988). The UFTA applies only to transfers made on or after January 1, 1987 and thus has no relevance to this case.

8. Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.
Cal.Civ.Code § 3439.04 (West 1970).

the firm with unreasonably small capital the transaction may be attacked.[9]

## 2. *Existing Case Law*

The few courts [10] that have looked at the reach of fraudulent conveyance law in the context of LBOs have based their decisions, implicitly at least, on whether there was evidence of intentional fraud. Thus, those transactions in which all was "above board" to begin with have been "ratified" by the courts even though the creditors may have suffered in the end. In *Credit Managers Ass'n v. Federal Co.*, 629 F.Supp. 175 (C.D.Cal.1985), the court dealt with an attack on an LBO transaction on the basis of theories the same as those of the Trustee in this case: fraudulent conveyance, improper distribution, and equitable subordination. The court, after noting the possibility that fraudulent conveyance law could vitiate all LBOs, refused to employ this approach and declined to overturn the LBO.

In contrast, when the LBO was intentionally designed to defraud the creditors, the courts have had little difficulty in finding the transaction fraudulent. In *United States v. Gleneagles Inv. Co.*, 565 F.Supp. 556 (M.D.Pa.1983), for example, the court found violations of both the intentional and constructive fraud sections of the UFCA. This decision was upheld by the Third Circuit in *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987), which relied substantially on the suspicious circumstances surrounding the transaction that evidenced actual intent to defraud. *Tabor*, 803 F.2d at 1297.

## 3. *Analysis of the Wolf & Vine LBO*

We decline to use the law of fraudulent conveyances to force the selling shareholders in this case to give up the payments they have received. We are so moved by a combination of factors. First,

---

**9.** Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.

Cal.Civ.Code § 3439.05 (West 1970).

**10.** Academics have recently joined the fray. Professors Baird and Jackson believe that fraudulent conveyance law should not be applied to LBOs. Baird & Jackson, *supra* note 3. They argue that LBOs are often economically efficient and may therefore benefit creditors. Thus, LBOs must not be penalized by a law designed to prevent "genuinely" fraudulent conveyances. From their perspective, the problem with applying fraudulent conveyance law to these transactions is that it gives creditors the ability to "whipsaw" the debtor, taking advantage of the successful LBO and suing under fraudulent conveyance theories if it is unsuccessful. Baird and Jackson also assume that creditors can protect themselves from dangers posed by LBOs by adjusting the terms on which they grant credit. In conclusion, Baird & Jackson find that "the inability of creditors to contract around the fraudulent conveyance remedy when it is in their interest may suggest that fraudulent conveyance law should be applied in bankruptcy to a narrow range of cases in which

there is little chance that creditors would find the transfer in their interest." *Id.* at 854. Presumably these cases would be those in which actual intent to defraud is present.

In *United States v. Tabor Court Realty Co.*, 803 F.2d 1288 (3d Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987), the court noted that Baird and Jackson's "analysis is limited to transactions in which 'the transferee parted with value when he entered into the transaction and [the] transaction was entered in the ordinary course.'" *Id.* at 1297 (quoting Baird & Jackson, *supra*, at 855). In several footnotes the court more directly criticized Baird & Jackson's premise that creditors could protect themselves from LBOs through contract provisions, noting that they fail to consider that some creditors, such as tax and judgment creditors, are involuntary creditors. *Id.* at 1297 n. 2. That, in fact, was the particular situation that court confronted. These involuntary creditors, such as tax claimants and tort judgment holders, have had no chance to agree to restrict LBO transactions. Another commentator has pointed out that realities of the marketplace make it likely that the creditors with the economic power to force a debtor to forego an LBO, or restrict the conditions under which one may take place, are more likely to take a security interest than they are to contract for restrictive conditions. This leaves only small trade creditors, with little relative economic power, at the mercy of a decision to undergo a buyout. Note, *Fraudulent Conveyance Law and Leveraged Buyouts*, 87 Colum.L.Rev. 1491, 1512 (1987).

there is no evidence of any intention on the part of the selling shareholders to defraud the corporation's creditors. Second, the selling shareholders did not know that Adashek intended to finance the purchases through an LBO. Third, the Trustee represents no creditors whose claims against the estate arose before July 31, 1979, and who did not have full opportunity to evaluate the effect of the LBO on Wolf & Vine's creditworthiness. Fourth, the form of the transactions employed by the LBO reflects a sale by Wolf and Marmon to an entity other than Wolf & Vine. Each of these factors requires amplification.

### a. *Intent to defraud*

Turning to intent to defraud, there is no evidence that the selling shareholders intended to defraud the Wolf & Vine creditors. Indeed, the Trustee has dropped any such claim on appeal and our review of the trial transcript indicates this was proper. Although lack of fraudulent intent does not bar a fraudulent conveyance claim under a constructive intent provision of the law, we hesitate to utilize constructive intent to frustrate the purposes intended to be served by what appears to us to be a legitimate LBO. Nor do we think it appropriate to utilize constructive intent to brand most, if not all, LBOs as illegitimate. We cannot believe that virtually all LBOs are designed to "hinder, delay, or defraud creditors."

### b. *Knowledge of leveraging*

The legitimacy of the LBO in this case is reinforced not only by the absence of an intent to defraud Wolf & Vine creditors, but also by the fact that Wolf did not know that his buyout would be leveraged. There was, in fact, uncontradicted evidence that

**11.** We note, however, that the Trustee never presented any evidence that a more thorough investigation would have turned up facts that would have put the selling shareholders on guard.

**12.** In some circumstances, of course, controlling shareholders of a corporation are obligated to make certain that the business's creditors are not harmed by transactions in which the business enters. *See, e.g., Pepper v. Litton,* 308 U.S. 295, 306–07, 60 S.Ct. 238, 245–46, 84 L.Ed. 281

Wolf did not know that Adashek had pledged Wolf & Vine assets to make the acquisition until the bankruptcy petition was filed more than two years after the sale of the Wolf stock. Reporter's Transcript (R.T.) II–156–60, 180–84. Whether Marmon knew about the method of acquisition is not clear from the record.

The Trustee makes much of the fact that the selling shareholders did not thoroughly investigate Adashek and his proposed business plan for acquiring and running the company.[11] The suggestion is that the ignorance of Wolf and possibly Marmon was the result of indifference. We are sensitive to the issue and in some circumstances would find it of controlling importance.[12] Here Marmon and Wolf appear to have been fairly careful in selecting a purchaser for the company. Clearly there was a screening of prospective purchasers. Several purchasers were rejected outright as not being financially sound enough to make the acquisition. R.T. II–155–56. Of greater importance is the fact that Wolf and Marmon knew that Adashek was backed by the Continental Illinois Bank which had agreed to issue a letter of credit to back the transaction. R.T. III–18. Admittedly, the LBO's legitimacy is not strengthened by the fact that neither Wolf nor Marmon asked Adashek for a financial statement, acquisition plan, or business plan.[13] R.T. II–54; II–162–63. But they were aware that Adashek's net worth was in excess of $5 million, that he was a successful investor, and that Continental was willing to back his purchase by the issuance of irrevocable letters of credit. We conclude the selling shareholders neither knew nor had reason to know that Adashek planned a leveraged acquisition of Wolf & Vine.

(1939); *Brown v. Presbyterian Ministers Fund,* 484 F.2d 998, 1005 (3d Cir.1973).

**13.** We note that from Wolf's perspective there was little point in investigating further because Marmon had long before agreed to buy him out. As far as he understood matters he was merely expediting the transaction by selling directly to Adashek instead of to Marmon and having Marmon resell to Adashek.

#### c. *Absence of July 31, 1979 creditors*

Our comfort with that conclusion is enhanced by the absence of presently existing creditors with claims that arose prior to the LBO. The Trustee, however, argues that there is such a claim. He contends that the National Industrial Group Pension Plan (NIGPP) has a claim that arose prior to July 31, 1979. A division of Wolf & Vine was a participant in this plan. Wolf & Vine withdrew from the plan on November 1, 1981 and it thereby incurred withdrawal liability[14] of $200,000. This withdrawal liability arose by virtue of the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), 29 U.S.C. § 1381 *et seq.* (1982). The MPPAA was not enacted until September 26, 1980, over a year after the sale of Wolf & Vine. Nonetheless, the Trustee argues that NIGPP, through the MPPAA, had a contingent claim prior to the sale date, July 31, 1979 because, prior to that date, Congress was actively considering passage of the bill that ultimately became the MPPAA.[15] The Trustee cites no authority for this proposition and we reject it. To make substantive results turn on when Congress commenced to consider a provision rather than when it was enacted would be to forsake the stability of a rock for the treachery of quicksand.

■ Thus, all existing creditors had the opportunity to gain the knowledge of Wolf & Vine's financial status and its heavy debt structure prior to extending credit to it.[16]

14. Withdrawal liability is imposed on employers that withdraw from the plan so that the plan will be partially reimbursed for the amount by which the plan is unfunded for benefits that are projected to accrue to that employer's employees.

15. The MPPAA was created to deal with the problems encountered by the Pension Benefits Guaranty Corporation (PGBC), a federally chartered corporation designed to guarantee benefits to employees whose plans had terminated. Its discretionary authority to force employers to pay the corporation for their unfunded pension benefits upon withdrawal was about to become mandatory. Congress was alarmed at the prospect of the PBGC being bankrupted by having to pick up the bill for financially troubled plans. Congress addressed the problem in two ways. First, it continually rolled back the date at which the PBGC became mandatorily obligated to pick up the liability for terminated plans. Second, it began to devise legislation that would force employers to pay their share of the PBGC's unfunded liability upon withdrawal by the employer. Proposals included a retroactive date in order to prevent employers from withdrawing during the time that the proposal was being considered by Congress. At one time the retroactive date was February 27, 1979. The bill was apparently under consideration during most of 1979 and 1980. When it was finally enacted, the retroactive date had been changed to April 29, 1980.

16. The relevant statutes dictate, in most cases, that a transfer cannot be set aside as a fraudulent conveyance unless the creditor had a claim in existence at the time of the purported fraudulent conveyance. Under section five of the UFCA, Cal.Civ.Code § 3439.05, however, a conveyance made without fair consideration that leaves the transferor with unreasonably small capital is fraudulent, despite lack of fraudulent intent, "as to creditors *and as to other persons* who become creditors during the continuance of such business or transaction." (emphasis added). Thus, it would appear that even a post-purchase transaction creditor, such as those present in this case, may attack a transaction if the other grounds of § 3439.05 are met. The California courts do not seem to have doubted the plain language of the statute that later-arising creditors may attack conveyances that meet the other requirements of the statute. (At least one California court, however, has stated that only a person that was a creditor at the time of the transaction has standing to sue under section five. *Pope v. National Aero Finance Co.*, 236 Cal.App.2d 722, 728, 46 Cal.Rptr. 233, 237 (1965) (referring to § 3439.04, .05, .06) (citing *TWM Homes, Inc. v. Atherwood Realty & Inv. Co.*, 214 Cal.App.2d 826, 843, 29 Cal.Rptr. 887, 896 (1963) (referring only to § 3439.04)).) But like Judge Rafeedie in *Credit Managers,* we believe this grant of standing to sue must be modified in light of an LBO in which there was no actual intent to defraud. Judge Rafeedie put it well:

> [W]hen the California legislature passed [the predecessor statute to § 3439.05] in 1939, it clearly did not intend to cover leveraged buyouts which are very public events. The legislature was addressing instead transactions that have the earmarks of fraud.... If there is no limit on when a creditor can sue to set aside a transfer, fraudulent conveyance law becomes an insurance policy for creditors.... Credit could liberally be extended to such companies regardless of their assets or cash flow with the knowledge that the buyout could always be attacked later if the company folded.

*Credit Managers,* 629 F.Supp. at 181. Because fraudulent conveyance statutes were designed to protect creditors from *secret* transactions by debtors, the same rules should not apply when the transaction is made public. Future creditors may not complain when they knew or

Creditors easily could have asked for financial information before extending credit. Moreover, the transaction was well-publicized within the industry. To ask Wolf to underwrite the creditors' losses, due partially at least to their failure to inquire adequately, would not be just.

#### d. *The form of the LBO*

As already mentioned, we are influenced by the formal structure of this LBO. The sale was complete as of July 31, 1979. Payments were spread over a three-year period. A large portion of the purchase price was paid on July 31, 1979, and the remainder was secured by an *irrevocable* letter of credit. Thus, the transaction bore the indicia of a "straight" sale rather than the marks of a serial redemption by Wolf & Vine of its own stock. The Trustee's case would be stronger had the "selling" shareholders known, or should have known, that their stock was being paid for by an asset depleting transfer by Wolf & Vine. This case, however, does not present such facts. In this case the creditors of Wolf & Vine were placed at risk by Adashek's failure to manage the business properly. Wolf and Marmon should not be considered Adashek's guarantor.

There is no evidence that Wolf and Marmon did not act in good faith throughout the transaction. They sold their shares for a fair price to another company that, though very thinly capitalized, was backed by the substantial personal assets of a wealthy purchaser and his relationship with a major bank. While we should not be understood as insulating all LBOs from fraudulent conveyance laws, we do affirm the district court's decision on the state

fraudulent conveyance law claim and the § 548 bankruptcy claim in this case.

#### C. *Improper Corporate Distributions*

■ We now address the Trustee's argument that the payments to Wolf and Marmon were improper distributions under Cal. Corp.Code §§ 500 and 501. We begin by repeating that the Trustee has no standing to attack the 1979 payments because no creditor exists holding a claim that arose before the 1979 payments. The Trustee also may not attack payments made by the Bank under letters of credit. The Trustee's contention that he has standing to attack the July 1980 payments and perhaps the July 1981 payment to Marmon is more substantial. To establish that the 1980–81 payments constituted improper distributions, the Trustee must show that at the time the payments were made, the corporation did not have enough retained earnings or was unable to meet its liabilities at the time of, or as a result of, the payments.

■ The district court dismissed these claims by summary judgment. It reached this conclusion by relating each installment payment back to the date of the initial transaction in 1979. Quite correctly, the Trustee points out that distributions to shareholders, however, must be scrutinized at the time they are made and not at the time the parties contracted that they would be made in the future. Cal.Corp.Code § 166 (West 1977 & Supp.1988); 1 Ballantine & Sterling, *California Corporation Laws* § 143.03[4][c], at 8–66 (4th ed. 1987).[17]

Under the district court's relation of all payments back to 1979 it focused its attention on the financial condition of the compa-

---

could easily have found out about the transaction. This certainly appears to be the case in this particular LBO. The transaction was well-publicized and the Trustee has not claimed or presented evidence that any of the future creditors were not aware of Wolf & Vine's financial dealings. In the context of this well-publicized LBO, this court will not permit later-arising creditors to attack an LBO purchase transaction as a fraudulent conveyance under section five of the UFCA.

**17.** For example, in *McConnell v. Estate of Butler*, 402 F.2d 362 (9th Cir.1968), the corporation

had enough money under the California earned surplus requirement to make the full distribution at the time the agreement to convert shares to debentures was made. However, by the time the debenture holders wanted to collect, the earned surplus requirement could no longer be met. The court, interpreting the predecessor statute to Cal.Corp.Code §§ 501 and 502, decided that the corporation had to be solvent and have sufficient surplus at the time the payment was made, not just when the deal was struck. *Id.* at 366; *see Robinson v. Wangemann*, 75 F.2d 756, 757–58 (5th Cir.1935).

ny at that time. It found that the capital left in the company was not "unreasonably small," one of the elements of an improper corporate distribution. Summary judgment against the Trustee followed thereafter. In reaching this result the court observed that it was:

> not persuaded that [the expert's] testimony, or any other evidence at trial, established a *prima facie* case that Wolf & Vine was left with an unreasonably small capital as a result of Adashek's financing his transaction as a leveraged buyout. In any event, there was certainly no evidence that the sale from Marmon and Wolf to Little Red Riding Hood left Wolf & Vine with unreasonably small capital.

Excerpt of Record (E.R.) tab 249, at 20–21.

■ We have some difficulty in sustaining the district court's summary judgment because of certain questions we have concerning the manner in which it reached its decisions.[18] We are convinced, however, that the district court reached the correct result. As already indicated, we do not view the 1980–81 payments as a distribution by Wolf & Vine to its former shareholders, Wolf and Marmon. They received the installment payments to which they were entitled under the sales agreement with Riding Hood. These payments, if distributions at all within the meaning of Cal. Corp.Code §§ 500 and 501, were distributions by Wolf & Vine to its then existing shareholder, Adashek, for whose benefit the distributions were made. In substance, no distributions to Wolf and Marmon were made. Adashek was the beneficiary of these distributions. What was said in Part B of this opinion concerning the appropri-

ateness of creditors of Wolf & Vine, whose claims accrued subsequent to the sale by Wolf and Marmon, looking to former shareholders for relief from the consequences of the subsequent failure of Wolf & Vine is equally applicable at this point. Were the proceeding arising from the bankruptcy of Adashek it would be pertinent to inquire whether Wolf and Marmon received a preference as a result of the 1980–81 payments. That, however, is not the issue before us.

We, therefore, conclude that Cal.Corp. Code §§ 500 and 501 are inapplicable to the 1980–81 payments to Wolf and Marmon. AFFIRMED.

---

**18.** The district court concluded, presumably as a result of the cross-examination of the expert witness, that the expert "made a number of assumptions which undermine the appropriateness of his findings," that he "used questionable methods in appraising the solvency of Wolf & Vine," that he failed "to research the business ..., discuss the company with former employees or others in the industry, or learn about the mannequin industry," and that he "was told to value the company as if it were liquidated and each asset was sold apart from all other assets and not to value it as a going concern." E.R. tab 249, at 19–20. Under cross-examination, the plaintiff's expert witness demonstrated he knew little about the mannequin industry in general and nothing about the valuation of assets. Our review of the trial tran-

script, R.T. III–151 to IV, pt. 1, at 61, supports the district court's view that the testimony of the Trustee's expert witness was hardly persuasive. Nonetheless, the district court did not ask, as it should have, whether the evidence permitted only one reasonable conclusion as to the verdict. *Peterson v. Kennedy,* 771 F.2d 1244, 1256 (9th Cir.1985), *cert. denied,* 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986). Instead, the district court appeared to focus on whether the Trustee had proved a "prima facie" case of unreasonably small capital. The district court apparently confused its analysis of whether the burden of proof on the issue of unreasonably small capital should have shifted to the plaintiffs, with the standard for rendering a directed verdict.