Fremont-Smith, J.
In this case, the plaintiffs Masco Building Products Corp.’s Thermador division (“Thermador”) and Sub-Zero Freezer Co. Inc. (“SubZero”) sold electrical appliances, including refrigeration equipment and freezers, to Indisco, Inc. (a subsidiary of Boyd Corporation) which was a wholesaler of electrical appliances, including those manufactured by the plaintiffs. James C. Boyd (“Boyd”) is the president and chief executive officer of Boyd Corporation and treasurer of Indisco. The plaintiffs contend that they are owed substantial money by Indisco for goods sold and delivered, but have not been paid because Indisco provided a guarantee of Boyd Corp.’s indebtedness and a security interest in all of its merchandise to Shawmut Bank, N.A. (“Shawmut”) and to Baybank Harvard Trust Company (“Baybank") in order to secure payment of $9.5 million of Boyd Corp.’s debt to said banks.[3] Plaintiffs seek to have this court annul the security interest and enter judgment against Shawmut and Baybank for the amount of Indisco’s unpaid balance to each plaintiff, on the ground that Indisco’s guarantee of Boyd Corp.’s debt and Indisco’s provision of a securiiy interest to the banks was without fair consideration and rendered Indisco insolvent, and therefore constituted a fraudulent conveyance in violation of G.L.c. 109A. The plaintiffs also seek judgment against Indisco, Boyd Corp. and Boyd individually for misrepresentations and against Indisco and the Boyd Corporation for violations of c. 93A, §11.
The case was tried jury-waived on April 11-14, 1994. Based on all of the credible evidence, the court makes the following findings of fact and rulings of law.
FINDINGS OF FACT
On August 11, 1992, this Court entered an order of partial summary judgment for Masco (here “Therm-ador”) in the amount of $234,692.69 plus interest and for Sub-Zero in the amount of $501,721.64 plus interest, against Indisco.
The evidence was also undisputed that, in early 1991, the Boyd Corp. began the process of closing its businesses, including Indisco, and liquidating assets in order to pay creditors, and that pursuant to the guaranty and securiiy interest from Indisco, all of the proceeds from the sale of Indisco’s assets, including Sub-Zero and Thermador inventory, were applied to pay down the banks’ loans.
Prior to October 11, 1988, when Indisco guaranteed Boyd Corp.’s debt and provided a securiiy interest to the banks, Indisco was the only profitable Boyd Corp. affiliate or subsidiary, i.e., the only such company with a positive cash flow. Boyd Corp., however, was operating at a loss, with negative cash flow, and cash generated by Indisco was being deposited into Boyd Corp.’s bank account and used to service Boyd Corp.’s bank loans, which then totalled about $10.5 million.
In April 1988, representatives of Shawmut met with James Boyd to review the debt of the Boyd Corp. to Shawmut. The bank representatives reviewed the increased expenses, decreased sales, increasing operating losses, lack of depth in financial management and the likely further erosion of profit margins due to competition from the new superstores, and informed James Boyd that they required, among other items, that Indisco guarantee payment of the Boyd Corp. debt to the banks[4] and provide a securiiy interest in all the inventory and receivables of Indisco.
On October 11, 1988, Indisco provided to Shawmut and Baybank a security interest in all its personal property and fixtures including its inventory, equipment, bank deposits, receivables, proceeds and accounts, to secure the debt of the Boyd Corporation to Shawmut and Baybank, and guaranteed the payment of the debts and obligations of the Boyd Corporation to Shawmut and Baybank.[5]
The financial condition of Boyd Corp. continued to deteriorate and, in October or November 1990, Indisco and the Boyd Corp. proposed to the banks a schedule of payments to Thermador and Sub-Zero on the outstanding balance due each company and the banks agreed to fund certain payments by Indisco to SubZero and Thermador. In return for the Boyd Corporation’s agreement in January 1991 to pay the outstanding debt of Indisco to Thermador in weekly payments of approximately $50,000, Thermador agreed to continue to ship products to Indisco. Similarly, Boyd Corporation agreed to make weekly payments to Sub-Zero on behalf of Indisco, in amounts ranging from $25,000 to $108,000, so that Indisco’s debt to Sub-Zero would be fully paid by April 26, 1991. All of the agreed payments, however, were not made.
I find that Indisco received no valuable consideration from Shawmut or Baybank for its grant of the securiiy interest or its guaranty of payment of the debt of the Boyd Corporation to Shawmut and Baybank. Defendants argue that the guarantee and security interests allowed Boyd Corp. to stay in business by *127 providing it with a continued line of credit, and thereby to continue to fund Indisco’s business operations. Defendants argue that therefore Indisco received, indirectly, fair consideration from the transaction. Here, however, unlike the situation in In Re Lawrence Paperboard Corp., 76 B.R. 866 (Bkrtcy. D.Mass. 1987), all of the intercompany benefits from the transaction flowed only one way (from Indisco to Boyd Corp.), and Indisco received nothing of value in return. Nor was there here, as in Lawrence, any identity of interest or identity of officers and directors between the parent and subsidiary corporations. Here, moreover, Indisco held itself out to the public as an independent distributing company, from which its name “Indisco” is derived. In these circumstances, there is no justification to pierce Indisco’s corporate veil. Moreover, Boyd Corp. and Indisco were separate corporations, and Indisco required no cash from Boyd Corp., or any line of credit from the banks, except that necessitated by Boyd Corp.’s siphoning of Indisco’s cash and surplus to pay Boyd Corp.’s debts.
I find, moreover, that Indisco’s assumption of Boyd Corp.’s debt rendered Indisco insolvent within the meaning of c. 109A, §2(1). When Indisco guaranteed payment of the full amount of the Boyd Corporation’s debt to the banks and granted a security interest in all its assets, the guarantee of Boyd Corp.’s payment became a contingent liability or a loss contingency of Indisco, which Financial Accounting Standards Board (“FASB”) Standard No. 5, paragraph 4(h), required, under accepted accounting practice, be recorded on the balance sheet of Indisco. This is because FASB Standard No. 5 requires a contingent liability to be rendered on the balance sheet when the occurrence of the entity is “probable”[6] and the amount of loss can be reasonably estimated.[7]
In view of the financial condition of Boyd Corp. and the economic recession at that time (October 1988), I find that it was probable, within the meaning of the FASB Rules, that Indisco would be called upon to pay, under its guarantee, the debt of the Boyd Corporation to the Banks, and that the contingent liability of Indisco to pay the debt of the Boyd Corporation to the banks should have been recorded as a liability on the balance sheet of Indisco.
While Indisco itself had a positive net worth of over $600,000 and was solvent before the October 11, 1988 transactions, Indisco’s guarantee of Boyd Corp.’s $7.7 million dollar liability produced a negative equity (i.e. an excess of liabilities over assets) of about $7 million.
“Fair value” analysis is somewhat different from a financial analysis, pursuant to GAAP. Under a “fair value” analysis, assets are valued at their actual market value — how much the asset could be sold for within a reasonable time. The fair value assumes a sale under some pressure to liquidate, but not the pressure of a “fire sale.” Under a GAAP analysis, assets are valued at the lower of historic cost minus depreciation, or current market value, whereas the “fair value” of a corporation’s assets may be higher or lower than the GAAP value, depending upon the actual market appreciation or depreciation of the value of the asset. I find that any reasonable adjustment of Indisco’s approximately $2 million in assets to reflect “fair value” as of October of 1988, rather than GAAP values, would not change the insolvency of Indisco, as “insolvency” is defined in c. 109A, §2. The liabilities, after the guarantee, of approximately $9 million, far exceeded any reasonable value of Indisco’s assets.
Indisco’s grant of a security interest and guaranty to Shawmut and Baybank also left Indisco with unreasonably small working capital (defined as current assets minus current liabilities) with which to do business. After the issuance of the guaranty and the security interest to the Banks, Indisco (which had previously had positive working capital) was left with more than $6 million negative working capital, as Indisco’s current liabilities then far exceeded its current assets. The result would not change significantly even if the $7.7 loan were reduced on Indisco’s books by ($2.2 million)[8] as a result of the anticipated reduction of the bank loans by the sale of Boyd Corp. real estate.
RULINGS OF LAW.
Under Chapter 109A (the Massachusetts version of the Uniform Fraudulent Conveyance Act, see G.L.c. 109A, §13), the granting by Indisco of the security interest and guarantee in October 1988 to Shawmut and Baybank was fraudulent if the guaranty and security interest were granted without fair consideration and either:
(1) rendered Indisco insolvent, G.L.c. 109A, §4; or
(2) left Indisco with unreasonably small capital, G.L.c. 109A, §5; or
(3) were made by Indisco with the intent or belief that Indisco would incur debts beyond its ability to pay as they matured, G.L.c. 109A, §6.
Shawmut and Baybank would have provided In-disco with fair consideration if:
(a) In exchange for the guarantee, Shawmut and Baybank had provided to Indisco, in good faith, funds which were a fair equivalent of the guarantee and security interest; or
(b) Shawmut and Baybank had received the security interest in good faith to secure a present advance to Indisco or an antecedent debt owing from Indisco to Shawmut and Baybank not disproportionally small as compared with the value of the guaranty and security interest.
Massachusetts General Laws c. 109A, §3.
As noted above, however, I find that the banks provided no such fair consideration to Indisco.
Moreover, every conveyance made and every obligation incurred without fair consideration when the *128 person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors. G.L.c. 109A, §6. Here, Indisco entered into the transaction with the knowledge that it would probably be thereby rendered unable to pay its other debts as they matured.
Additionally, notwithstanding defendants’ aver-ments to the contrary, plaintiffs have standing to assert a violation of c. 109A, §5. Defendants maintain that Kupetz v. Wolf, 845 F.2d 842 (9th Cir. 1988), and Credit Managers Ass’n v. Federal Co., 629 F.Supp. 175 (C.D. Cal. 1985), stand for the proposition that the coverage of §5 excludes creditors such as Thermador and Sub-Zero that maintain open trade accounts with debtors like Indisco. This mischaracterizes Kupetz and Credit Managers Ass’n, which merely hold that §5 may not serve to protect creditors in the situation of a leveraged buyout (“LBO”),[9] because fraudulent conveyance statutes such as c. 109A, §5 were designed to protect creditors from secret transactions by debtors, whereas, in an LBO, the creditors are aware of the leveraging of the assets. Kupetz, supra at 849 and n. 16. See also In re Aluminum Mills Corp., supra (distinguishing LBO from open trade account situation). Here, where the debt is not based on an LBO but is based on an open trade account with a steady back- and-forth flow of product shipped on credit and payments, plaintiffs have standing under §5.
As I find that the security interest and guarantee were entered into without fair consideration, and rendered Indisco insolvent, and with unreasonably small working capital, which Indisco knew could not be paid on demand, the provision of security interest and guarantee were fraudulent conveyances violative of sections 1,3,5 and 6 of c. 106A and must be set aside.
The court, however, finds that the plaintiffs lack standing to assert a violation under c. 109A, §4. As the amounts plaintiffs seek to recover all resulted from sales made and debts incurred by Indisco after the October 1988 transaction with the banks, plaintiffs lack standing under Section 4.[10]
Nor does the court find that James C. Boyd misrepresented to the plaintiffs so as to render him personally liable for fraud, or that the information which Indisco provided to Dunn & Bradstreetwas fraudulent or relied upon by the defendants in delivering their products. Accordingly, the court finds in favor of the defendants on plaintiffs’ c. 93A allegations.
JUDGMENT
Judgment shall enter against Shawmut Bank and Baybank Harvard Trust Company in the sum of $234,692.69 for the plaintiff, Masco Building Products Co. and in the sum of $501,721.64 for Sub-Zero Freezer Co., Inc., plus interest from the date of the filing of the complaint.

 Indisco had no indebtedness to the defendant banks prior to its guarantee of Boyd Corp.’s indebtedness.

 The Boyd Corporation’s debt to the banks was in the form of a demand note which could be called by the banks for full payment by Boyd or Indisco at any time.

 These documents were executed for Indisco by Mr. Bab-cock, Chief Financial Officer of Boyd Corp. Babcock was not an officer of Indisco and there was no evidence to indicate that he had any corporate authority to execute the documents on behalf of Indisco.

 A future event is “probable” when it is less certain than “reasonably probable” and more certain than “remote.” FASB, Standard No. 5, Accounting for Contingencies, Paragraph 3 (a)-(c).

 Defendant’s expert opined that the amount of Indisco’s loss from Boyd Corp. debt could not be estimated because Boyd Corp., without Indisco, had $13.3 million fixed assets which provided an ample surplus to pay the $7.7 million bank debt, and that neither condition of the FASB rule was satisfied so as to require inclusion of the Boyd Corp. debt on Indisco’s balance sheet. The court rejects this argument because, although Boyd Corp. did have assets valued by the defendants at $13.3 without Indisco, Boyd Corp. had no available cash and would have had to liquidate its business to pay off the debt, unless it looked to Indisco for payment. James Boyd admitted in his testimony that he never even considered liquidating the Boyd Corp. business to save Indisco. Defendants’ valuation of Boyd Corp.’s net assets, moreover, is open to question in view of its having been carried at appraised value without regard to environmental contamination of the real estate. I find, therefore, that it was probable, in October 1988, as defined in FASB, that Indisco would be called upon to pay the entire amount of Boyd Corp.’s loan, unless the economy were to improve and Boyd Co.’s business were to be turned around. While I find that the latter was certainly something that the defendants could have hoped for, it was not something that they could have reasonably expected to occur.

 Nor could Indisco’s balance sheet assets be properly enlarged to reflect the approximately $3.3 million owed it by Boyd Corp., on a fair value analysis, as defendant’s expert contended, as I find that there was no probability that Boyd Corp. would or could have sold off sufficient assets to have enabled it to pay back both the banks and Indisco. In 1988, Boyd Corp. (without Indisco) had a loss of $2 million and the economy remained poor.

 An LBO is a purchase transaction based on pledging the assets of the purchased entity to secure the purchase price. In re Aluminum Mills Corp., 132 B.R. 869, 878 and n .4 (Bkrtcy. N.D. Ill. 1991).

 See In re Morse Tool, Inc., 148 B.R. 97, 131 (Bkrtcy. D.Mass. 1992) (holding that UFCA §4 “limits standing to creditors whose claims against the creditor were in existence at the time the interest was transferred or the obligation incurred”); In re The Ohio Corrugating Company, 91 B.R. 430, 440 (Bkrtcy. N.D. Ohio 1988) (in construing Ohio’s version of UFCA, the court held that “UFCA Section 4 does not permit a credit whose claim matured subsequent to the allegedly fraudulent transfer to set aside the transfer . . .” (emphasis added)); Kupetz, supra at 847-50 and n. 16 (9th Cir. 1988), and Credit Managers Ass’n, supra at 181 (C.D. Cal. 1985). See also Alces, Peter A., The Law of Fraudulent Transactions, par. 5.04 (Warren, Gorham & Lamont, Inc. 1989) (“[t]he UFCA distinguishes between the causes of action available to present creditors, that is, those holding claims at the time of an alleged fraudulent conveyance, and future creditors, those whose claims come into existence sometime after the challenged conveyance.”)