**In re PEET PACKING COMPANY, Debtor.**

**Randall L. Frank, Trustee, Plaintiff,**

v.

**Eli Zaret, Defendant.**

**Randall L. Frank, Trustee, Plaintiff,**

v.

**McNish–Dennehy Agency, Inc., Defendant.**

**Bankruptcy No. 95–20725.**
**Adversary Nos. 97–2096, 97–2095.**

United States Bankruptcy Court,
E.D. Michigan,
Northern Division.

Jan. 29, 1999.

Geoffrey L. Silverman, Attorney at Law, West Bloomfield, MI, for Eli Zaret.

Jonathan S. Green, Donald J. Hutchinson, Attorneys at Law, Detroit, MI, for McNish–Dennehy Agency.

Robert A. Weisberg, Attorney at Law, Birmingham, MI, for trustee.

### OPINION ON APPLICABILITY OF BUSINESS CORPORATION ACT TO UNIFORM FRAUDULENT CONVEYANCE ACT

ARTHUR J. SPECTOR, Bankruptcy Judge.

#### Introduction

In this opinion, the Court holds that Mich. Comp.Laws § 450.1122(3) does not bar a plaintiff from suing the transferee of a fraudulent conveyance under Mich.Comp.Laws § 566.11 *et seq.* if the transferee is not a shareholder in the corporate transferor.

On January 17, 1994, Dennis McLain and Roger Smigiel signed a promissory note in favor of the Dennehy Agency, Inc. The amount borrowed was $1,113,800.00. The promisors were McLain, Smigiel, and Peet Packing, Inc. (In addition to signing the note in his individual capacity, Smigiel signed as Peet Packing's president.) The proceeds of the loan were used by McLain and Smigiel to purchase 51% ownership of Peet Packing. The company paid off the note by means of four separate payments as follows: (1) January 21, 1994 ($235,800.00); (2) February 27, 1994 ($292,666.00 and $292,667.00); and (3) April 19, 1994 ($292,667.00). These payments roughly corresponded to the payment schedule set forth in the note.

An involuntary chapter 7 bankruptcy petition was filed against Peet Packing on June 29, 1995. The Court entered an order for relief, and Randall Frank was appointed as the trustee. He commenced A.P. No. 97–2095 against what is now called the McNish–Dennehy Agency, Inc., seeking to recover the note payments pursuant to Michigan's version of the Uniform Fraudulent Conveyance Act, Mich.Comp.Laws § 566.11 *et seq.* (the "UFCA").

The other adversary proceeding, A.P. No. 97–2096, was filed by the trustee against Eli Zaret. In that action the trustee seeks to avoid certain pre-petition transfers made to Zaret, again on the strength of the UFCA. Among the transfers is a $50,000.00 payment which ostensibly discharged a promissory note that McLain and Smigiel had executed in Zaret's favor. The trustee alleges that Smigiel and McLain had borrowed this sum of money from Zaret to purchase outstanding shares of the debtor, and that it was the debtor which actually repaid the loan.

The Defendant in each action filed a motion for summary judgment. Both motions are based on the theory that application of the UFCA is precluded by the Business Corporation Act, Mich.Comp.Laws § 450.1101 *et seq.* (the "BCA").

## Discussion

Section 122 of the BCA was amended in 1989 to provide that "[t]he [UFCA] ... shall not apply to distributions governed by this act." Mich.Comp.Laws § 450.1122(3). A "distribution" is defined as

... a direct or indirect transfer of money or other property, except the corporation's shares, or the incurrence of indebtedness by the corporation to or for the benefit of its shareholders in respect to the corporation's shares. A distribution may be in the form of a dividend, a purchase, redemption or other acquisition of shares, an issuance of indebtedness, or any other declaration or payment to or for the benefit of the shareholders.

Mich.Comp.Laws § 450.1106(3).

Given the term's definition, it is obvious that the Defendants—neither of whom ever owned shares in the Debtor—received no "distribution." (Zaret's counsel readily conceded that fact at the hearing. Counsel for McNish–Dennehy, while not conceding the point, also did not seriously contest it.) This is so because as to the Defendants, payments from the Debtor were not in recognition of— or, to use the statute's terminology, "in respect to"—an ownership interest in the Debtor. Rather, the payments were simply made to discharge an outstanding loan obligation.

However, the Defendants argue that the undertaking of the note obligations and/or the repayment of the indebtedness gave rise to an indirect distribution to either McLain and Smigiel or the holders of the shares which they purchased. Since the transfers at issue included the payment of a distribution, the Defendants reason, the preemption clause contained in BCA § 122(3) applies.

The Defendants' loans were used to accomplish something like a leveraged buyout, or "LBO." *See generally, e.g., Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635, 645 (3d Cir.1991) ("A leveraged buyout refers to the acquisition of a company ('target corporation') in which a substantial portion of the purchase price paid for the stock of [the] ... target corporation is borrowed and where the loan is secured by the target corporation's assets. Commonly, the acquirer invests little or no equity."); 3 Norton Bankruptcy Law and Practice 2d § 58A:1 (1998) ("LBOs are typically structured ... [such that] loan proceeds are used to make cash payments to the shareholders of the target, and ... the credit and/or assets of the target are committed to repayment of the loan."). In such a transaction, a case can be made for the proposition that the selling or purchasing shareholders of the target have in effect been paid a distribution. *See id.* ("[I]f the acquired company commits its credit or pledges its assets to repay a financing party[,] ... it can be argued that the use of the acquisition loan proceeds to pay shareholders of the acquired company for their stock is essentially a corporate dividend...."); *In re Munford, Inc.,* 97 F.3d 456, 460 (11th Cir.1996); *Kupetz v. Wolf,* 845 F.2d 842, 851 (9th Cir.1988). *But see In re C–T of Virginia, Inc.,* 958 F.2d 606, 614 (4th Cir.1992).

The Michigan Court of Appeals was confronted with an argument along these lines in *Pittsburgh Tube Co. v. Tri–Bend, Inc.,* 185 Mich.App. 581, 463 N.W.2d 161 (1990). The third-party plaintiffs in that case were formerly the sole shareholders of Tri–Bend. *Id.* at 583, 463 N.W.2d 161. They had sold their shares, with Tri–Bend's assets serving as security for payment of the purchase price. *Id.* at 583–84, 463 N.W.2d 161.

Tri–Bend's assets were sold at a foreclosure sale. *Id.* at 584, 463 N.W.2d 161. A dispute arose over rights to the sale proceeds, with the plaintiff—a judgment creditor of Tri–Bend's—contesting the validity of the third-party plaintiffs' security interest. *Id.* at 584–85, 463 N.W.2d 161. It argued that in selling their shares, the third-party plaintiffs realized "a dividend." *Id.* at 588, 463 N.W.2d 161.

The court acknowledged that any such "dividend would be illegal because it was made while the corporation was insolvent or when the corporation would be rendered insolvent by the dividend." *Id.* But it rather summarily rejected the proposition that a dividend had in fact been paid, concluding instead that "[t]he transaction was nothing more and nothing less than a purchase and

sale of Tri–Bend's stock." *Id.* at 589, 463 N.W.2d 161.

*Pittsburgh Tube* is certainly contrary to the Defendants' contention that dividends were paid in the present cases—at least insofar as the selling shareholders are concerned. And we are bound to adhere to that decision "unless convinced that the Michigan Supreme Court would decide the question differently." *United of Omaha Life Ins. Co. v. Rex Roto Corp.*, 126 F.3d 785, 789 (6th Cir. 1997). We need not predict the course of action which Michigan's highest court would take, however, as we believe the Defendants' motions must be denied in any event.

For present purposes, we will assume that execution of the notes and payments made thereon resulted in current or former shareholders of the debtor realizing a distribution. The question we address is whether that assumed fact precludes the trustee from invoking the UFCA against the Defendants.

It is clear from what has been said so far that in a transaction of this sort, two distinct parties benefit from a single payment—namely, the third-party payee and the shareholder. Since only the benefit received by the latter can be characterized as a distribution, the application of § 122(3) to the other, third-party transfer requires a legal fiction: The third party must be deemed to have received a "constructive" distribution, notwithstanding his non-shareholder status. This is so for the simple reason that § 122(3) refers to *distributions*—not to payments which are associated with a distribution, or have the collateral effect of creating one.

Legal fictions, of course, are not unknown to courts. But their use is limited to circumstances in which they are needed to serve some higher purpose—such as promoting equity or, perhaps, to effectuate legislative intent. With respect to the former consideration, the Defendants do not allege, nor is there any reason to suppose, that there are special circumstances here which would make it inequitable or unjust to subject the transactions to the provisions of the UFCA.

On the matter of statutory intent, we are unaware of any legislative history which explains why dividends are excluded from operation of the UFCA. However, a comparison of that act with the BCA sheds some light on the subject.

The UFCA arms creditors with grounds for invalidating certain payments made by a financially troubled corporation. Section 5 states that "[e]very conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors." Mich.Comp.Laws § 566.15. *See also* Mich.Comp.Laws § 566.14 ("Every conveyance made ... by a person who is or will be thereby rendered insolvent is fraudulent as to creditors ... if the conveyance is made ... without a fair consideration."); Mich.Comp.Laws § 566.16 ("Every conveyance made ... without fair consideration when the person making the conveyance ... intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to ... creditors."); *see also* Mich.Comp.Laws §§ 566.19(1)(a) and 566.20(c) (giving creditors the power to "set aside" a fraudulent conveyance); *see generally Foodland Distribs. v. Al–Naimi*, 220 Mich.App. 453, 480, 559 N.W.2d 379 (1996) (O'Connell, J., concurring in part and dissenting in part) ("[C]orporations ... [are] 'persons' within the meaning of [the UFCA]....").[1]

The BCA provides analogous protection for corporate creditors with respect to distributions. That act states that "[a] distribution shall not be made if, after giving it effect, the corporation would not be able to pay its debts as the debts become due ..., or the corporation's total assets would be less that the sum of its total liabilities." Mich.Comp.Laws § 450.1345(3). *Cf.* Mich. Comp.Laws § 1450.1855a ("Before making a distribution of assets to shareholders in dissolution, a corporation shall pay or make provision for its debts, obligations, and liabilities."). A director who "vote[s] for, or con-

---

1. The other two judges on the panel concurred with respect to this portion of Judge O'Connell's opinion. *See Foodland Distribs.*, 220 Mich.App. at 455, 559 N.W.2d 379.

cur[s] in" the payment of a "distribution to shareholders contrary to this act" is "liable to the corporation for the benefit of its creditors." Mich.Comp.Laws § 450.1551(1)(a). *Cf.* Mich.Comp.Laws § 450.1271(b) (referring to "an action by or in the right of the corporation to procure a judgment . . . against an . . . officer or director of the corporation for loss or damage due to his unauthorized act"). Shareholders may also be "liable to the corporation for the amount . . . received in excess of the[ir] . . . share of the amount that lawfully could have been distributed." Mich. Comp.Laws § 450.1551(3). *See Fireman's Fund Ins. Co. v. Harold Turner, Inc.,* 159 Mich.App. 812, 816–17, 407 N.W.2d 82 (1987) (per curiam) (A corporate creditor can use Mich.Comp.Laws § 450.1551(3) "[t]o recover" a distribution paid to the corporation's shareholders.).[2]

Both the BCA and the UFCA, then, address the problem of payments made to the detriment of a corporation's creditors. *See generally* R. Clark, *The Duties of the Corporate Debtor to Its Creditors,* 90 Harv.L.Rev. 505, 554–555 (1976–77) (describing the "restraint on . . . distributions" imposed by the Model Business Corporation Act[3] and state

corporation statutes as "a straightforward expression of fraudulent conveyance principles").

Given this overlap, it is easy to understand why the legislature might choose to limit application of the UFCA to non-distributions: If nothing else, such a step streamlines the law with respect to distributions and eliminates redundancy. *See generally* Mich. Comp.Laws § 450.1103(a) (A purpose of the BCA is "[t]o simplify, clarify, and modernize the law governing business corporations."). It perhaps could also be argued that removing distributions from the scope of fraudulent-conveyance law makes sense as a matter of substantive policy. *See* Clark, 90 Harv. L.Rev. at 559 ("[S]tatutory restrictions on shareholder distributions . . . are easily administrable mechanical tests that facilitate corporate planning and decisionmaking, whereas . . . section 5 [of the Uniform Fraudulent Conveyance Act] provides a vague and uncertain standard. . . . Management especially wants bright lines concerning the chief recurrent transfers without fair consideration that a corporation makes—dividends and other distributions to shareholders.").[4]

2. *Fireman's Fund* held that such a creditor can also invoke the UFCA against the shareholders. *See Fireman's Fund,* 159 Mich.App. at 816–18, 407 N.W.2d 82. In this respect, the case was superseded by the BCA preemption clause at issue here.

3. This model was drafted by the Committee on Corporate Laws of the Section of Business Law of the American Bar Association. *See* 1 Model Business Corporation Act Annotated (3d ed.1997), at xxviii. The BCA's restriction on distributions, *see* Mich.Comp.Laws § 450.1345, is similar to § 6.40 of the model act.

In 1980, the Committee "added an optional provision preempting the applicability of 'any other statutes of this state with respect to the legality of distributions,' which was specifically aimed at fraudulent transfer laws." K. Kettering, *The Pennsylvania Uniform Fraudulent Transfer Act,* 65 Pa. B. Ass'n Q. 67, 83 (1994). However, "that provision was dropped without explanation in the 1984 revision." *Id.*

4. While conceding this benefit, Clark nonetheless argues that state "fraudulent conveyance statute[s] . . . ought to be interpreted as providing an *additional* set of restrictions that dividends and similar distributions must satisfy." Clark, 90 Harv.L.Rev. at 558. He suggests that the typical corporation statute's "minimum capital" require-

ments offer much less protection to creditors than does § 5 of the Uniform Fraudulent Conveyance Act. *Id.* at 556.

It may be that at least some states have since addressed what Clark referred to as "[t]he porosity of ordinary corporation law's barriers against [capital] outflows." *Id.* at 557. *See* 4 Model Business Corporation Act Annotated at 6–208 (Official Comment and Annotation to § 6.40) ("The 1980 financial amendments were based on the premise that the complex rules established by earlier versions of the Model Act did not provide realistic protection to creditors. . . ."). And as Clark himself implicitly acknowledged, the more general proposition that distributions ought to be subject to fraudulent conveyance law is controversial. *See* Clark, 90 Harv.L.Rev. at 558 n. 154 ("The great [Garrard] Glenn . . . makes the . . . argument that the theory of fraudulent conveyances will not fit the case of an improper dividend . . . [and] that 'the law of the corporation's being' should govern.'" (citation omitted)); *see also* B. Markell, *Toward True and Plain Dealing: A Theory of Fraudulent Transfers Involving Unreasonably Small Capital,* 21 Ind.L.Rev. 469, 508 n. 158 (1988) ("It makes little sense . . . to enact statutes specifically designed to regulate the shareholder/corporation relationship if common law concepts [brought into play by general fraudulent-conveyance laws] will always; or nearly

Assuming that these objectives underlie the BCA's exclusion of the UFCA, we see no reason why the exclusion need be extended to third parties. Counsel for Zaret asserted that doing so is necessary to preclude an end-run around the exclusion. This is so, he says, because allowing the corporation (or its creditor) to recover from the third party via the UFCA means that the third party will then have a cause of action against the corporation's shareholder. The upshot, he argues, is that the shareholder will be forced to disgorge the distribution—a result at odds with § 122(3).

The weakness in this argument, of course, is that whatever cause of action the third party might have in the foregoing scenario, it obviously could *not* be based on the assertion that the shareholder's distribution was in contravention of the UFCA. The most one can say is that, to the extent the corporation is successful in invoking the UFCA against the third party, the latter party may (or may not) have grounds for recovering against the shareholder on some non-UFCA theory. *See, e.g.,* Zaret's Third–Party Complaint at ¶ 11 ("In the event that the Trustee's allegation regarding the Payment is true, then [third-party defendants] McLain and Smiegiel [sic] have failed to repay the Indebtedness under the Note."); *id.* at ¶ 21 ("In the event that Zaret is held liable [to the trustee] . . ., Zaret is entitled to common-law indemnity from McLain and Smiegiel [sic].").  Thus Zaret's argument boils down to the proposition that § 122(3)'s preemption clause was meant not only to shield recipients of a distribution from UFCA actions, but also to insulate them from causes of action which were triggered by a successful UFCA lawsuit.

As a preliminary matter, it strikes us as highly unlikely that lawmakers would choose to protect shareholders from litigation which has only a tangential relationship to a UFCA action. (The very idea conjures up the rather silly prospect of a shareholder/defendant raising the affirmative defense that the plaintiff lost a UFCA action brought by the corporation.)  And while we are mindful of the fact

that the BCA is to be "liberally construed," Mich.Comp.Laws § 450.1103, there certainly is nothing in § 122(3) which warrants the inference that the legislature meant to be *that* solicitous about the sanctity of distributions.

Even if we were to accept Zaret's dubious proposition at face value, the argument gets him nowhere. The legislature could have achieved its supposed objective in one of two ways. It could have precluded the third party from bringing an "indirect" UFCA action against the shareholder, or it could have opted to preclude the corporation from bringing a *direct* UFCA action against the third party.

Zaret implicitly assumes that lawmakers chose the latter route when they amended the BCA to add the preemption clause. Yet the BCA provides the corporation and its creditors with no explicit right of recovery against the third party. This omission is significant since the third party is an entity which by hypothesis has either obtained something for nothing, *see* Mich.Comp.Laws §§ 566.14, 566.15 and 566.16 (referring to conveyances made "without fair consideration"), or facilitated the corporation's scheme "to hinder, delay, or defraud . . . [its] creditors." Mich.Comp.Laws § 566.17.

Neither logic nor the language of § 122(3) supports the conclusion that the legislature intended to shield third parties from liability under both the UFCA *and* the BCA. Put simply, if the preemption clause really was meant to insulate shareholders from indirect UFCA actions, we are confident that a dispensation to entities in the Defendants' position was not part of the bargain.

Finally, it is suggested that the Defendants' interpretation of § 122(3) promotes the BCA's objective of "simplify[ing] . . . the law governing business corporations." Mich. Comp.Laws § 450.1103(a). We believe, however, that application of our construction of that provision is entirely straightforward. Under § 122(3) as we construe it, the UFCA

always, usurp their function. Given the set of balances a legislative body strikes in creating corporations . . ., Professor Clark's position seems to pass wide of the mark."); Kettering, 65

Pa. B. Ass'n Q. at 85 n. 77 and accompanying text (citing Glenn, Clark, and other commentators who have weighed in on the issue).

is preempted only if the conveyance alleged to be fraudulent constitutes a distribution *to the party receiving the conveyance.* It makes no difference whether some other party realized a distribution as an incidental effect of the conveyance.

In these proceedings, BCA § 122(3) is irrelevant because neither of the Defendants received a distribution. Accordingly, their respective motions have been denied.