513 F.2d 807
 In the Matter of KETTLE FRIED CHICKEN OF AMERICA, INC.,
Bankrupt (two cases).
Jesse W. STANLEY, Respondent-Appellant,
v.
Dan D. BROCK, Jr., Trustee in Bankruptcy, Petitioner-Appellee.
William W. SCALF et al., Respondents-Appellants,
v.
Dan D. BROCK, Jr., Trustee in Bankruptcy, Petitioner-Appellee.
 Nos. 74-1645, 74-1646.
 United States Court of Appeals,
Sixth Circuit.
 April 22, 1975.
 
 Nolan Carter, Jr., Allen, Duncan & Arnold, Joseph L. Arnold, Lexington, Ky., for respondents-appellants in 74-1645.
 Joe C. Savage, Turley, Savage & Moore, Lexington, Ky., for respondent-appellant in 74-1646.
 Frank S. Ginocchio, Dan D. Brock, Jr., Lexington, Ky., for petitioner-appellee.
 Before WEICK and ENGEL, Circuit Judges, and O'SULLIVAN, Senior Circuit Judge.
 ENGEL, Circuit Judge.
 
 
 1
 This is an appeal from a judgment of the district court requiring certain former shareholders of Kettle Fried Chicken of America, Inc. to refund to the trustee in bankruptcy payments they had received from the bankrupt corporation in repurchase of its capital stock at a time when its capital was found to be impaired. We affirm.
 
 
 2
 Kettle Fried Chicken of America, Inc., hereinafter Kettle, was incorporated under the laws of Delaware in March, 1968. After its initial incorporation, the authorized capital of Kettle was increased and several stock splits occurred. In October 1968, the original investors sold approximately 50% of the equity of the corporation to a group of new investors known as the "Cincinnati group".
 
 
 3
 At a Board of Directors' meeting in February, 1969, it was decided that the corporation would attempt to buy back from some of the shareholders their common stock in Kettle, the stock to be used as part of a plan to attract needed key personnel. This buy back program was initiated although the corporation then had in its treasury over 600,000 shares of its own stock. Between March 13 and March 19, 1969, 75,500 shares of stock were repurchased by Kettle from the five defendants here at ninety cents per share, for a total cash payment by Kettle of $67,950.
 
 
 4
 Of the 75,500 shares acquired by Kettle in March, 1969, from the defendants, 25,000 shares were resold and transferred by a Mr. Fishkin at $1.10 per share. Kettle apparently entered into contracts with two other persons for resale of the other purchased shares, but both deals ultimately fell through. Under the contracts of sale the purchasers had a right to cancel the agreement if Kettle failed to obtain approval of the Ohio Securities Commission for the stock sale within 45 days after the date of the agreement. It is clear that Mr. Flory cancelled his contract to purchase 25,000 shares under this provision. Although there is some dispute as to whether Mr. Luby remains liable on his contract, he attempted to rescind by cancelling payment on his check for the stock on March 31, 1969.
 
 
 5
 The corporation began to suffer more severe financial difficulties in 1969, caused at least in part by the depressed financial and economic conditions of the fast food industry. In October, 1969 several of Kettle's directors resigned and the Board discussed filing for the corporation a Chapter XI proceeding in bankruptcy. On March 5, 1970 Kettle made an assignment for the benefit of creditors under state law. On June 5, 1970 it was adjudged bankrupt.
 
 
 6
 The trustee in bankruptcy brought this action against the five shareholders who sold their stock back to the corporation in March, 1969. The action was brought under § 70(e) of the Bankruptcy Act, 11 U.S.C. § 110(e). That section provides in part:
 
 
 7
 "A transfer made or suffered or obligation incurred by a debtor adjudged a bankrupt under this title which, under any Federal or State law applicable thereto, is fraudulent as against or voidable for any other reason by any creditor of the debtor, having a claim provable under this title, shall be null and void as against the trustee of such debtor."
 
 
 8
 The trustee, in bringing his § 70(e) action, invoked Title 8, § 160, Delaware Statutes, which he claims allows a creditor to void the stock purchase which occurred here. At the times relevant to this litigation, § 160 provided:
 
 
 9
 Every corporation may purchase, receive, take or otherwise acquire, own and hold, sell, lend, exchange, transfer or otherwise dispose of, pledge, use and otherwise deal in and with its own shares; but no corporation shall use its funds or property for the purchase of its own shares of capital stock when the capital of the corporation is impaired or when such use would cause any impairment of the capital of the corporation, except that it may purchase or redeem out of capital its own shares of preferred or special stock in accordance with section 243 of this title. Shares of its own capital stock belonging to the corporation or to another corporation, if a majority of the shares entitled to vote in the election of directors of such other corporation is held, directly or indirectly, by the corporation, shall neither be entitled to vote nor be counted for quorum purposes. Nothing in this section shall be construed as limiting the right of any corporation to vote stock, including but not limited to its own stock, held by it in a fiduciary capacity.[1]
 
 
 10
 The referee found as a matter of fact that the capital of the corporation was impaired at the time of the stock repurchase by Kettle. Damages of $45,450 were assessed pro rata against the five defendants.
 
 
 11
 Defendants raise four issues on this appeal. Their first contention is that the transactions involved here were not a "purchase" within the meaning of Section 160. Since Kettle had already lined up purchasers to buy the stock from the corporation at a higher price per share when it bought the stock from defendants, they contend that the transaction was a purchase not by the corporation, but rather by Messrs. Fishkin, Flory and Luby, the corporation merely acting as a conduit between the defendants and the subsequent purchasers.
 
 
 12
 We agree with the trustee that the term "purchase" as used in Section 160 must be given its normal meaning and that so construed, Kettle must be considered as the purchaser of the stock. It bought the stock directly from defendants. The sale was not conditioned upon Kettle's ability to resell the stock to any third party, although preliminary plans for the resale had been made. There was no contractual relationship, either written or verbal, between defendants and the three men who the corporation expected ultimately to acquire the stock.
 
 
 13
 In Alcott v. Hyman, 42 Del.Ch. 233, 208 A.2d 501 (1965), the Delaware Supreme Court rejected a similar effort to place a strained interpretation on the use of the word "purchase" in Section 160. Plaintiffs argued there that the transaction in question did not constitute a "purchase" by the corporation of its own stock because the corporation had received cash and an assumption of liabilities as well as receiving its own stock. The Delaware Court held otherwise:
 
 
 14
 "They argue, however, that the transaction was not a 'purchase' because AAP received cash and an assumption of liabilities as well as its own stock. We find no merit in this contention." 208 A.2d at 508.
 
 
 15
 Appellants' second contention is that the referee erred in finding that the capital of the corporation was impaired at the time the stock was repurchased by the corporation.
 
 
 16
 Appellants admit that if Kettle's assets are measured at book value as shown on the balance sheet of March 31, 1969, capital impairment is shown. However, they urge, if "fair market value of all assets as a package" is considered, then the evidence before the referee required him to hold that the capital was not impaired at the time of repurchase. Appellants rely especially upon the well-reasoned opinion of Judge Haynsworth in Mountain State Steel Foundries v. Commissioner of Internal Revenue, 284 F.2d 737 (4th Cir. 1960). There, construing a similar West Virginia statute, the court held:
 
 
 17
 "At least until the highest court of West Virginia should otherwise decide, we think for our collateral purpose the statute should be construed as prohibiting the purchase of its own stock if the use of its funds for the purpose would deplete the realizable value of its assets to a point below the total of its liabilities and capital." 284 F.2d at 741 (emphasis added)
 
 
 18
 However, Judge Haynsworth further commented:
 
 
 19
 "If we are to look to actual values in applying the statute, the spirit of the statute requires that they be conservatively determined. Opinion evidence of appreciation should be received with skepticism if insolvency ensues. . . ." 284 F.2d at 742
 
 
 20
 We are, of course, obliged to look to Delaware law. Capital impairment as such is not defined in the Delaware statutes. The Court of Chancery of Delaware has endeavored to define the term in In re International Radiator Company, 10 Del.Ch. 358, 92 A. 255 at 256 (1914):
 
 
 21
 In the statute the impairment of the "capital" of the company is mentioned. As here used, this means the reduction of the amount of the assets of the company below the amount represented by the aggregate outstanding shares of the capital stock of the company. In other words, a corporation may use only its surplus for the purchase of shares of its own capital stock. "Capital" does not in this connection mean the assets of the company, for, of course, the assets are reduced when any of it is used by a corporation to purchase shares of its own capital stock. It must have some other meaning then. The statute must mean, therefore, that the funds and property of the company shall not be used for the purchase of shares of its own capital stock when the value of its assets is less than the aggregate amount of all the shares of its capital stock. A use by a corporation of its assets to purchase shares of its own capital stock under such conditions impairs the capital of the company. 92 A. at 256
 
 
 22
 The same construction of Delaware law has been recognized by this circuit in Ashman v. Miller, 101 F.2d 85 (6th Cir. 1939).
 
 
 23
 In re International Radiator Company, supra, did not present the precise issue of whether, if compelled to make a choice, the Delaware courts would use book or actual value in measuring assets for the purpose of determining whether the capital of the corporation was impaired, and we are unable to find any certain guidance either from the above quotation or from any other Delaware source. We conclude, however, as we believe the referee did, that the capital of Kettle was impaired under either test.
 
 
 24
 It is true that the referee relied primarily upon the March 31, 1969 balance sheet of Kettle as evidencing its capital impairment at the time of the purchases of stock earlier that same month. If a balance sheet test is employed, there was insufficient surplus in the usual sense to cover the purchase, and impairment resulted. The referee, however, did not stop there, nor did the proofs. He made pointed reference to the testimony of the company president, Paul T. Milliken, that the figures in the Price-Waterhouse report of March 31, 1969 fairly reflected the actual as well as the book value of the assets. Further, the referee expressly recognized appellants' argument. He cited Mountain State Steel Foundries, supra, with approval, and even paraphrased its language to observe that "The spirit of capital impairment statutes requires that actual values be conservatively determined". To all this, we can only observe additionally that the relatively brief span of time between the 1968 incorporation and the March, 1969 sale strengthens the likelihood that actual value would not have departed too drastically from book value in that period. What Judge Haynsworth was seeking was a "more objective standard than a computation which is the product of years of financial history of an enterprise". 284 F.2d at 741.
 
 
 25
 A further objection by appellants to use of the March, 1969 balance sheet as evidence of value was that it failed to include any "package" or " going concern" value of the corporation. While there is authority that in a proper case such values may be included among corporate assets when capital impairment is under consideration, Bishop v. Prosser-Grandview Broadcasters, Inc., 3 Wash.App. 43, 472 P.2d 560 (1970), we are satisfied that the referee did not err in rejecting it upon the evidence here. The record convincingly establishes that the enterprise never got off the ground and never produced anything but deficits. Under such circumstances to have attributed a solid cash value to the high hopes of speculators interested in investing in the enterprise is hardly consistent with the conservative determination of actual value which Mountain State Steel Foundries, supra, counsels.
 
 
 26
 Accordingly we conclude that the determination that Kettle's capital was impaired within the meaning of the Delaware statute was not clearly erroneous.
 
 
 27
 Appellants' third contention is that even if the purchase of stock was made at a time when the capital of the corporation was impaired, the repurchase did not cause any detriment to creditors of the corporation because, although the corporation paid appellants $67,950 for the stock, it had contracts with Mr. Fishkin, Mr. Luby and Mr. Flory to resell the stock for more than was paid for it.
 
 
 28
 Mr. Fishkin went through with his agreement to purchase 25,000 shares at $1.10 per share. Mr. Flory and Mr. Luby, however, refused to complete their contracts of purchase. Appellants contend that Mr. Luby remains liable on his contract to purchase the shares of stock in question and, therefore, since the corporation has a cause of action to collect this amount from him, it has suffered no detriment by its stock purchase from appellants. We cannot agree.
 
 
 29
 Since the trustee has filed no cross-appeal here, we do not reach the difficult legal question of whether the referee should have allowed any set-off. Cf. Lytle v. Andrews, 34 F.2d 252 (8th Cir. 1934), United Thacker Coal Co. v. Peytona Lumber Co., 15 F.Supp. 40 (D.C.W.Va., 1936). Here the referee reduced appellants' liability from $67,950 which they received to $45,450, thus crediting appellants with $22,500 of the money received when the 25,000 shares were resold to Mr. Fishkin.
 
 
 30
 Even if we assume that liability to return the moneys received here could in a proper case be the subject of set-off, the referee did not err in refusing to allow a set-off for the amount of stock purchased by Mr. Luby. Although Mr. Luby signed a contract to purchase the stock, he cancelled payment on the check for the stock and the stock was never issued to him. The corporation treated the stopping of payment on the check as a cancellation of the contract and never contemplated legal action to compel performance by Luby. We can think of no good reason for allowing credit for what was never received and have not been shown any authority for such a contention.
 
 
 31
 The referee found the corporation's "economic" damage to be $45,450 and judgment was entered in that amount against the defendants. Obviously in reaching this figure, the referee gave credit for the sale of the 25,000 shares to Mr. Fishkin. In doing so, however, he computed the credit on the basis of ninety cents per share, the price at which defendants sold the stock to Kettle, rather than $1.10, the price Kettle received from Fishkin. Defendants claim they were entitled to credit at $1.10 per share or $27,500 instead of at ninety cents, or $22,500. In their brief, they treat this difference as a mathematical error of the referee subject to mere technical correction on appeal. There was no error by the referee either in law or in computation. He simply refused to give them credit for the $5,000 profit on resale.
 
 
 32
 As mentioned earlier, there was no privity of contract between defendants and Fishkin. When we consider as well the objects of the statute and the interests of the creditors of the corporation, we find no good reason for giving the defendants the benefit of the additional $5,000 received by Kettle from Fishkin.
 
 
 33
 Finally, appellants contend that Section 160 should not be construed to permit a remedy for creditors against innocent shareholders who have sold stock to the corporation in good faith and without knowledge that the capital of the corporation was impaired at the time of the sale. We recognize that the referee made a specific finding that "defendants were not aware of the pall of illegality surrounding this transaction".[2]
 
 
 34
 Appellants rely particularly upon McDonald v. Williams, 174 U.S. 397, 19 S.Ct. 743, 43 L.Ed. 1022 (1899). In McDonald, the United States Supreme Court held that although the National Bank Act made it ultra vires for the directors of a national banking association to declare a dividend out of capital, innocent shareholders who received the dividend in good faith and believed it to come out of the surplus of the corporation would not be required to pay the amount of the dividend over to the receiver for the bankrupt corporation. Appellants also cite Bartlett v. Smith, 162 Md. 478, 160 A. 440 (1932); Bates v. Brooks, 222 Iowa 1128, 270 N.W. 867 (1937), and Wood v. National City Bank, 24 F.2d 661 (2nd Cir. 1928). These cases, like McDonald, involve dividends rather than stock repurchases.
 
 
 35
 It may fairly be observed that these cases have but limited precedential value for, as noted by the trustee, "the purchase of its own stock by a corporation is not its usual or ordinary course of business and in no sense is comparable to the declaration of a corporate dividend". More to the point, we think, is Hamor v. Taylor-Rice Engineering Co., 84 F. 392 (Cir.Ct. Delaware, 1897). There a shareholder sold his stock back to the corporation at a time when the capital of the corporation was allegedly impaired and received the corporation's note. After the corporation became insolvent, the shareholder attempted to file a claim as a creditor of the corporation. The receivers objected, alleging that the stock purchase had occurred at a time when the capital of the corporation was impaired, though the corporation was not at that time insolvent. Construing the forerunner to Section 160 and the common law of Delaware, the court held:
 
 
 36
 "But whether a corporation be solvent or insolvent, the fund represented by its capital stock must remain inviolate for the protection of its creditors. In the absence of statutory authority in that behalf a corporation has no legal power to reduce this fund by any formal or voluntary act or contract on its part, to the prejudice of its creditors either then or thereafter existing, whether by distributing any part of it by way of dividend, or by giving any part of it to one or more stockholders, or by disposing of it in any other manner, except by way of changing its form to meet the exigencies of the corporate business. Such an act or contract is ultra vires, not only of the directors or stockholders, but of the corporation itself." 84 F. at 397
 
 
 37
 The court concluded that if the stock purchase had been made at a time when the capital of the corporation was impaired (which was not clear from the record), the transaction was void as against the trustee. Thus, the shareholder would have no right to assert his claim for the amount which the corporation owed him on the note. Cf. Gibbon v. Hill, 79 F.2d 288 (3rd Cir. 1935).[3]
 
 
 38
 While in Hamor, supra, the shareholder was filing a claim as a creditor, we think its logic is persuasive and is applicable here. Where the corporate act is illegal, the shareholder's lack of knowledge of the illegality cannot be controlling and the transaction is voidable by the trustee for the creditors.
 
 
 39
 Appellants contend that since the legislature has provided a specific remedy against the directors of the corporation under Section 174[4] and provided no express remedy against the shareholders under Section 160, we should not imply one.
 
 
 40
 An examination of the relevant case law indicates that appellants' contention on this point must also be rejected. In Powers v. Heggie, 268 Mass. 233, 167 N.E. 314 (1929), and Bartlett v. Smith, 162 Md. 478, 160 A. 440 (1932), the Supreme Courts of Massachusetts and Maryland, interpreting the prior Delaware capital impairment statute, concluded that the legislature in providing a specific remedy against directors in no way intended to relieve shareholders of liability.
 
 
 41
 As did the courts in both Powers and Bartlett, supra, we find persuasive the following language from Williams v. Boice, 38 N.J.Eq. 364, 369:
 
 
 42
 "The statute does not transfer the liability from the stockholders to the directors, but it creates a liability on the part of the latter in favor of the corporation or the creditors in certain events. * * * The stockholder who has received part of the capital by way of dividend, without legislative authority, has no right to it as against the creditors of the corporation, and no wrong is done him if he be compelled to repay it when it is required to pay the debts of the corporation. * * * But that provision does not, either in terms or by implication, exonerate the stockholders. * * * The remedy given by the statute is cumulative. The Legislature does not say that the stockholders shall be at liberty to keep the money, and that the creditors must have recourse to the directors alone."
 
 
 43
 Williams v. Boice, supra, as quoted in Powers v. Heggie, 167 N.E. at 318
 
 
 44
 To like effect under Illinois law, see Reilly v. Segert, 31 Ill.2d 297, 201 N.E.2d 444 (1964), in which the Supreme Court of Illinois held that "The existence of a statutory provision dealing with the liability of directors does not preclude a non-statutory liability on the part of shareholders". Reilly v. Segert, supra, at 445. Thus, the court in Reilly held the shareholders could be held liable to the receiver for the creditors of the corporation.
 
 
 45
 The judgment of the district court is affirmed. Costs to appellees.
 
 
 
 [1]
 Section 160 has since been amended by the Delaware legislature, 59 Del.Laws, c. 106, § 3
 
 
 [2]
 Other than this, the referee made no finding relating to good faith and innocence of wrongdoing. All defendants except Lynch were original shareholders. Defendants Stanley and Scalf were vice-president and secretary-treasurer, respectively, of Kettle
 
 
 [3]
 In Gibbon, a panel of the Third Circuit interpreting a similar New Jersey capital impairment statute, concluded that a shareholder who sold his stock to the corporation at a time when the capital of the corporation was impaired was liable to the creditors' representative in an action brought to recover those amounts. This conclusion was reached although, as here, the corporation was not rendered insolvent by the stock purchase
 
 
 [4]
 At the time relevant to the transactions involved here, § 174 provided:
 "(a) In case of any willful or negligent violation of the provisions of sections 160 . . . the directors under whose administration the same may happen shall be jointly and severally liable, at any time within six years after paying such unlawful dividend or after unlawful stock purchase or redemption, to the corporation, and to its creditors in the event of its dissolution or insolvency, to the full amount of the dividend unlawfully paid, or to the full amount unlawfully paid for the purchase or redemption of the corporation's stock, with interest from the time such liability accrued. Any director who may have . . . dissented from the act or resolution by which the same was done, may exonerate himself from such liability by causing his dissent to be entered on the books containing the minutes of the proceedings of the directors at the time the same was done, or immediately after he has notice of the same.
 (b) Any directors against whom a claim is successfully asserted under this section shall be entitled to contribution from the other directors who voted for or concurred in the unlawful dividend, stock purchase or stock redemption.
 (c) Any director against whom a claim is successfully asserted under this section shall be entitled, to the extent of the amount paid by him as a result of such claim, to be subrogated to the rights of the corporation against stockholders who received the dividend on, or assets for the sale or redemption of, their stock with knowledge of facts indicating that such dividend, stock purchase or redemption was unlawful under this chapter, in proportion to the amounts received by such stockholders respectively."
 Section 174 has since been amended by the Delaware legislature, 59 Del.Laws, c. 106, § 6.