In re INTEGRA REALTY RESOURCES, INC. and Integra—a Hotel and Restaurant Company Tax I.D. No. 48–0764252 and BHC of Denver, Inc. Tax I.D. No. 74–27914828, Debtors.

Jeffrey A. WEINMAN, as Trustee for the Integra Unsecured Creditors' Trust, Plaintiff,

v.

FIDELITY CAPITAL APPRECIATION FUND, et al., Defendants.

Bankruptcy Nos. 92 18853 DEC, 92–18854–PAC and 92–18855–CEM. Adv. No. 94–1370 PAC.

United States Bankruptcy Court, D. Colorado.

June 27, 1996.

John C. Smiley, Harold G. Morris, Jr., Lindquist, Vennum & Christensen, Denver, Colorado, for plaintiff.

James S. Dittmar, Frank C. Huntington, Hutchins, Wheeler & Dittmar, Boston, MA, for defendants.

### ORDER ON PRELIMINARY DISPOSITIVE MOTION

PATRICIA A. CLARK, Bankruptcy Judge.

The matter before the Court is the preliminary dispositive motion filed by Fidelity Capital Appreciation Fund (Fund), the response thereto filed by Jeffrey A. Weinman (Trustee), as Trustee for the Integra Unsecured Creditors' Trust (Trust), and the Fund's reply to the response. The Fund requests a determination on three dispositive issues: whether the settlement payment defense of 11 U.S.C. § 546(e) applies; which state's statute of limitations applies on the fraudulent conveyance claim; and whether the unlawful dividend statute of Delaware applies.

The Trustee pursuant to 11 U.S.C. §§ 544 and 550 is trying to avoid as a fraudulent transfer and an unlawful dividend the Spin–Off transfer of Show Biz Pizza Time, Inc. stock to former shareholders of Integra. The defendants in this action assert that the Trustee's claim to avoid the transfer of Show Biz Pizza stock are barred by 11 U.S.C. § 546(e), the statute of limitations and the inability to recover an unlawful dividend from shareholders.

Briefly, the relevant facts are:

1. By 1986, Integra owned about 90% of the outstanding common stock of ShowBiz. That interest had increased from 80% to 90% due to a restructuring of ShowBiz debt. The restructuring was assisted by the Hallwood Group, a merchant banking firm, who acquired 14% of Integra's common stock and was given the right to nominate 5 of Integra's 7 directors.

2. At the beginning of 1988, Integra had two lines of business. First, it owned and operated 38 hotels in 22 states. Most of the hotels were under national chain licensing agreements. Second, it owned and operated 183 restaurants in 21 states, 125 of which were Show Biz or Chuck E. Cheese; another 58 Monterey Houses were operated by a subsidiary BHC Acquisition Corporation (BHC or BAC).

3. In July of 1988, Integra began restructuring. It sold all shares of BHC to ShowBiz for $11 million. The $11 million was added to ShowBiz's intercompany debt to Integra, raising that debt to approximately $29.5 million. ShowBiz obtained a $10 million 5–year loan from the Bank of Boston secured by, among other things, a priority security interest in ShowBiz's assets, a pledge of ShowBiz's stock in BHC and a guaranty from Hallwood. ShowBiz also got a $5 million loan from Hallwood which was subordinated to the Bank of Boston loan. Then, ShowBiz paid $12.5 million to Integra using some of the proceeds of the loans from the Bank of Boston and Hallwood to reduce its intercompany debt from $29.5 to $17 million. The $17 million debt was evidenced by a five-year term note from ShowBiz to Integra. Integra paid the $5 million loan of ShowBiz from Hallwood. There was a complicated agreement with ShowBiz, Hallwood and Integra, the most integral portions required SEC registration of ShowBiz stock, required Integra to distribute its shares of ShowBiz stock in kind to its shareholders not later than December 29, 1988.

More specific details of the Spin–Off are:

a. On August 8, 1988 the *Wall St. Journal* reported that Integra was to spin-off ShowBiz.

b. Through a unanimous consent in lieu of meeting as of October 1, 1988, Integra's board resolved to effectuate the spin-off by distributing the company's shares of ShowBiz common stock to its shareholders with each holder of record entitled to receive 0.425 shares of ShowBiz common stock for each share of Integra common stock. First National Bank of Chicago was authorized to act as distribution agent for the Spin–Off by delivering certificates for ShowBiz common stock to the record owners of Integra common stock as of the record date.

c. ShowBiz applied to have its common stock qualified for trading on the NASDQ in mid-October 1988; that application was granted by NASDQ. Also, on October 17, 1988, ShowBiz filed a registration statement on form S–1 with the SEC. The registrations statement related to the 3,833,103 shares of ShowBiz which Integra was going to distribute to its shareholders, along with additional ShowBiz common stock that might be issued in connection with the Rights Offering. The statement eventually was amended to say that on December 30, 1988, Integra was going to distribute approximately, 3,825,700 shares of ShowBiz common stock as of the December 9, 1988 record date.

d. On November 8, 1988, the *Wall St. Journal* reported that the distribution ratio for the Spin–Off would be .4225 shares of ShowBiz common stock for each share of Integra common stock.

e. Pursuant to a November 18, 1988 Distribution Agent Agreement with Integra and ShowBiz, First Chicago was to calculate the number of shares of Show Biz common stock due to the Integra common stockholders as of the record date, and upon receipt of proper authorization from Integra, to deliver the stock certificate reflecting the number of shares being distributed.

f. On November 29, 1988, through unanimous consent in lieu of a meeting, the Integra Board of Directors resolved that the Spin–Off record date would be December 9, 1988. This news was reported in the December 1, 1988 *Wall St. Journal.* On December 5, 1988, Integra, ShowBiz and Hallwood amended the July 30, 1988 Agreement which stated that the Spin–Off would occur no later than

December 30, 1988 and the distribution ratio would be .429.

g. On December 2, 1988 the New York Stock Exchange notified its members about the Spin–Off explaining that between 12/5–12/30 the common stock of Integra could be traded two ways: with or without the right to receive a corresponding number of Show-Biz shares.

h. On December 14, 1988, the SEC declared the registration statement was effective.

i. On December 14, 1988, ShowBiz mailed to each shareholder of Integra or ShowBiz common stock a prospectus on the distribution to occur on December 30, 1988. The Registration statement and prospectus contained this statement:

> Possible Claims of Integra Creditors. Integra has informed the Company that so long as it does not experience a material adverse change in its cash flow from continuing operations, consummates the sale of certain assets, receives the proceeds of certain anticipated borrowings and the scheduled payments on the Integra Loan, it will have sufficient funds to satisfy its future cash requirements. **If, however, Integra is unable to satisfy its future cash requirements, a recipient of the Company's Common Stock in the Integra Distribution might be required to surrender to a trustee in bankruptcy, or creditors, of Integra the shares of the Company's Common Stock received in the Integra Distribution, or the value thereof.**

Emphasis added.

j. According to Integra's transfer records maintained by First Chicago, as of December 9, 1988, there were 5,415 record owners of Integra common stock located in all 50 states.

k. As of December 9, 1988, a national clearing agency for securities transactions, Depository Trust Company (DTC) held approximately 6,439,722 Integra shares for its participants. Its participants were brokers and financial institutions who hold stock in street name on behalf of their customers. DTC held approximately ⅔rds of all Integra shares.

l. On December 28, 1988, DTC notified its participants of the Spin–Off date and that it would receive shares from the distribution agent and would credit the shares by book-entry to each participant's account with DTC.

m. The closing took place on December 30, 1988. Integra delivered to First Chicago a stock certificate reflecting the 3,822,230 shares of ShowBiz common stock to be distributed, a notice authorizing the distribution and a stock power assigning the shares. First Chicago delivered a receipt and confirmation that the distribution of the ShowBiz common stock had been effectuated. The subcontractor of First Chicago, American Transtech mailed the ShowBiz stock certificates to the record owners and one certificate to DTC for over ⅔rds of the total shares held by DTC through its nominee Cede & Co.

n. One share of Integra common stock was exchanged for one share of new Integra (which now only owned and operated hotels) and .429 shares of common stock in ShowBiz which owned and operated restaurants.

o. DTC credited each participant's accounts.

p. On January 3, 1989, the *Wall St. Journal* reported that Integra completed distribution of its 90% stock interest in ShowBiz to its own shareholders.

q. A share of old Integra was valued at $4⅞ on January 3, 1989 and in exchange for that share on January 4, 1989 the shareholder received one share of new Integra valued at $1¾ and .429 shares of ShowBiz valued at $5.50 per share. Thus, the old Integra $4⅞ share interest became interests worth $7¼.

r. On January 4, 1989, ShowBiz common stock began public trading. Its closing price that day was $5.50 per share. The closing price of Integra common stock dropped from $4.875 per share on January 3 to $1.75 on January 4, 1989.

s. Show Biz filed an amendment with the SEC to indicate that 3,822,230 shares of Show Biz common stock were distributed to its shareholders through the Spin–Off.

t. The Spin–Off was treated by Integra as a tax-free distribution under Section 355 of the Internal Revenue Code. The Internal Revenue Service did not object to that treatment.

4. On July 14, 1992 Integra filed a petition for relief under Chapter 11. On February 11, 1994 the 1st Amended plan was confirmed. The Plan provided for the formation of the Unsecured Creditors' Trust. The Plan incorporated a Settlement Agreement dated October 20, 1993 between Integra, the Creditors Trust, various individuals and entities, including Hallwood and the five directors of Hallwood who were also Hallwood-nominee directors of Integra and ShowBiz. The agreement provided for Hallwood to purchase newly-issued common stock of reorganized Integra for $1 million. Then Integra assigned the $1 million to the Creditor's Trust along with the right to bring any claims it might have arising from the Spin–Off, the Creditors' Trust's release of Hallwood and the five Hallwood nominee directors of Integra from any claims arising from the Spin–Off and the released parties' payment of $9 million to the Trust.

## I. The Application of Section 546(e) to the ShowBiz Spin–Off

There are several critical provisions of the Bankruptcy Code which are considered to determine whether the Trustee is able to prosecute the subject claims. First, Section 546(e) provides:

Notwithstanding sections 544, 545, 547, 548(a)(2) and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, *or settlement payment,* as defined in section 101 or 741 of this title, *made by or to* a commodity broker, forward contract merchant, stockbroker, *financial institution,* or *securities clearing agency,* that is made before the commencement of the case except under section 548(a)(1) of this title.

Emphasis added.

Second, Section 741(8) provides:

"settlement payment" means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment or any other similar payment commonly used in the securities trade,

The legislative intent behind Section 546(e) is set forth in H.Rep. No. 420, 97th Cong., 2d Sess. 1 (1982), "to minimize the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries."

The Fund argues that the Spin–Off stock transfer falls within the ambit of Section 546(e) and precludes the Trust from avoiding or setting aside the transfer. The Fund maintains that the definition of settlement payment is extremely broad, broad enough to encompass the Spin–Off. The Spin–Off was the completion of a securities transaction which entailed the exchange of an investor's equity interest in one company (hotel and restaurant company) for other property interests in a hotel business and a restaurant business. The Fund contends that since the Spin–Off dividend of registered stock is within the purview of the SEC, it is a securities transaction. The Fund asserts that "settlement" includes any delivery of stock to complete a securities transaction. Finally, it argues that the distribution of the Show Biz stock was a "payment" in settlement of the securities transaction. Under that argument the payment was the delivery of specific property and once the corporate dividend was declared, it was a corporate debt owed to shareholders who could have commenced suit to compel payment.

The next prong of the Fund's argument relates to the transfer of the "settlement payment" to a financial institution or securities clearing agency. The Fund claims that the transfer of shares began with a transfer to First Chicago which then transferred to, among others, DTC a securities clearing agency. DTC then transferred the shares to its participants; thereby effecting both a transfer by a clearing agency and to stockbrokers and financial institutions. Even if not all shares were distributed through DTC, it was a settlement payment due to the transfer by First Chicago.

In addition, the Fund contends that legislative history and public policy to promote settled securities transactions support finding the transfer to be a settlement payment.[1] It prevents the ripple effect on the market in the avoidance of such transactions years after the fact, making markets unstable. Furthermore, institutions have changed position in reliance by using the dividend to collateralize future margin account investments, etc. The Fund maintains that since a lot of the shareholders were IRAs, 401(k) plans or other retirement accounts, avoiding the transfer would upset the shareholders' retirement planning.

The Fund also asserts that because the Spin–Off was well-publicized creditors had ample opportunity to challenge it either before it occurred or immediately thereafter and subsequent creditors could not have reasonably extended credit to Integra in reliance upon any assumed ownership of Show-Biz.

In addition, the Fund claims that the creditors should have proceeded against Hallwood and its nominees who controlled Integra's Board. The substantial settlement shows that the Trust was not without a remedy through a suit for damages against specific individuals or institutions for unlawful acts.

Alternatively, the Fund maintains that the July 1988 restructuring constituted a securities transaction that was to be completed by the distribution of ShowBiz stock to Integra shareholders. The obligation to spin-off arose from a written agreement among Integra, ShowBiz and Hallwood that was an integral part of the July 1988 restructuring. ShowBiz became obligated to make the rights offering and issue debentures and warrants for the purchase of its common stock. Along with the Spin–Off, ShowBiz previously paid $12.5 million to Integra and delivered a $17 million term note to Integra. Show Biz borrowed $15 million from Bank of Boston and Hallwood and Integra repaid ShowBiz' $5 million loan from Hallwood. Thus, the Fund argues that the Spin–Off was a securities transaction in itself and it constituted a transfer of securities in exchange for a variety of corporate restructuring measures including the offering and issuance of other securities. The restructuring and agreement required the registration with the SEC of three securities. The securities registered were: 1) the rights, 2) the units of debentures and warrants and 3) the ShowBiz stock. It also required the issuance of rights and units along with the Spin–Off distribution of stock. The distribution was the completion of the contractual requirement through a series of interrelated securities transactions.

Conversely, the Trust argues that the definition of "settlement payment" should not be boundless and that it only applies if made as part of a securities transaction which occurs

---

1. The Fund cites many portions of the SEC brief submitted in the *Schwab* case. These arguments go to the policy of undoing securities transactions:

   Impact on stability of system:
   It makes no difference whether the broker from whom the payments are recovered was an intermediary or a beneficial owner. The Broker would be confronted in either case with the unanticipated need to make a substantial payment and could as a result face a capital or liquidity problem ... Thus, interpreting Section 546(e) to include payments received by beneficial owners that are part of the clearance and settlement system furthers the Congressional purpose of protecting the system from instability attributable to bankruptcies.
   SEC brief at 14–15.
   Risk to capital markets:
   The diminished investor confidence that would result if long-settled securities transactions can be reversed would create an

   environment hostile to capital formation. Moreover, the possibility that settled transactions can be reversed could lead to an increase in both the cost and volatility of transactions in the capital markets ... Thus, there are strong policy reasons supporting a statutory interpretation that promotes finality in securities transactions. *Id.* at 18
   The harm to creditors does not justify disrupting the transaction:
   These adverse consequences for creditors, however, are the inevitable result of Congress' balancing of the need to protect creditors against the need to protect settlement payments made by or to participants in the securities markets. Congress, by enacting Section 546(e), determined that settlement payments ... should be shielded from the full reach of the creditor protections of the fraudulent conveyance laws, with recovery permitted only for transfers occurring within one year of a bankruptcy petition that involve actual fraud. *Id.* at 19.

according to an agreed upon exchange for consideration. Here, the debtor gave away to its equity holders its most valuable asset, its shares in ShowBiz without an exchange of consideration for shares. No action was required on the part of the shareholder recipients. The Prospectus dated December 14, 1988 and ShowBiz Registration Statement dated December 5, 1988 stated:

> Holders of Integra common stock *will not be required to pay any cash or other consideration or take any other action* in order to receive the shares of the Company's Common Stock to which they are entitled pursuant to the Integra Distribution. The Integra Distribution will not affect the number of shares of Integra common stock outstanding.

Emphasis added. At best, the Trust asserts that the transaction was a post-settlement function, an administrative processing activity in connection with existing shares. It characterizes the transfer as a dividend and notes that the SEC in an amicus brief submitted in the *Kaiser Steel* litigation stated that dividends do not involve an exchange and are declared by directors, thus, they don't fall within the definition of settlement payment.

The Trust continues its argument claiming that the transfer was not an exchange of equity interests in Integra for other property interests. It contends that their equity interests were transfigured, but that mere change in the form of ownership is not an exchange. The shareholders gave up nothing, they retained the devalued and eventually worthless Integra stock and received shares of ShowBiz (which would be insulated from the claims of Integra's creditors). Again, the Trust maintains that the delivery of the shares was not a settlement payment as it was not made pursuant to an exchange.

The Trust scoffs at the idea of a ripple effect on financial markets. The clearing houses guaranteed no transaction and were mere administrative functionaries, performing a routine delivery service. The only risk is to defendants and merely because they did something with the shares after receiving them, such as using them for collateral, does not exempt the debtor's transfer from avoidance.

The Trust contends that the other policy arguments regarding who was in a better position to evaluate the risk of the transfer and to protect themselves are not convincing. The defendants were advised that one risk of the transfer was a lawsuit. *See* the Registration Statement at page 11. Thus, it is not compelling to uphold the transaction so that the shareholders reap its benefits without exposure to the risks of which they were advised.

Finally, the Trust argues that ShowBiz' actions in offering to enter into the transactions (involving rights, debentures and warrants) are readily separated from the debtor's transfer in contractual provisions, the Registration Statement and in consummation of the agreements. Hence, the restructuring was not a securities transaction that was settled by the distribution of ShowBiz stock to Integra shareholders.

There does not appear to be a case directly on point to assist in determining whether the transaction at hand constituted a settlement payment. Several of the leading cases in this jurisdiction which discuss settlement payment arose out of the Kaiser Steel leveraged buy out (LBO). The SEC has declined to file an amicus brief to aid the Court in its analysis.

One case was decided by Judge Kane, *In re Kaiser Merger Litigation,* 168 B.R. 991, 1001 (D.Colo.1994). There Judge Kane stated, "while the definition of 'settlement payment' is broad, it is not boundless." Judge Kane refused to apply the settlement payment defense for a lack of evidence or authority that consideration was exchanged for the right to purchase preferred shares that might not even be issued; he noted that such an exchange was not a settlement as such term is used in the securities industry.

Another case, *Kaiser Steel Corporation v. Charles Schwab & Co., Inc.,* 913 F.2d 846 (10th Cir.1990) (*Schwab*), held that LBO consideration in the form of cash and preferred stock, processed on its journey to the shareholders by various intermediaries in the national clearance and settlement system

could not be recovered from those intermediaries because of Section 546(e). The LBO consideration was paid out in exchange for shares of the target company and constituted a settlement payment. The LBO alone was a securities transaction settled through that exchange of consideration.[2] There, the shareholders approved the LBO. The Court noted that Congress did not limit Sections 546(e) and 741(8) to "securities contracts" or to "trades" and that to impose such a limitation would be judicial legislation. Thus, it concluded: "Given the wide scope and variety of securities transactions, ... there is no reason to narrow the plain concept of 'settlement' to a single type of securities transaction." *Id.* at 848. (Each industry reference relied upon by the court referred to settlement in the context of the completion of a securities transaction.)

The district court's decision in *Schwab, In re Kaiser Steel Corp.*, 110 B.R. 514, 522 (D.Colo.1988), has Judge Kane noting with approval the broad definition of settlement made by the Group of Thirty, a private sector group concerned with the international financial system. Their definition of settlement was "the completion of a transaction wherein securities and corresponding funds are delivered and credited to the appropriate accounts."[3] He also observed that the term settlement payment "should be given a reasonably flexible meaning with reference to industry practice." *Id.* at 522. He noted that the securities clearing process facilitates a wide variety of "corporate actions", including "public offerings, rights issues, entitlement issues, warrants, tender offers, exchanges, and bonus shares." *Id.* note 4.

An additional case is *Kaiser Steel Corporation v. Pearl Brewing Company*, 952 F.2d 1230 (10th Cir.1991). In that case, the *Schwab* ruling was extended to cover the Kaiser shareholders' receipt of the LBO consideration. The Court explained: "disruption in the securities industry—an inevitable result if leveraged buy outs can be freely unwound years after they occurred—is also a harm the statute was designed to avoid." *Id.* at 1240. The Court noted that the Kaiser shareholders had "effectively sold their equity interests [in old Kaiser] to the new investors in exchange for money and a continuing stake in the new entity as preferred shareholders." *Id.* at 1290.

There are three questions before the Court involving the Section 546(e) defense. The first is whether the Spin–Off constituted a settlement payment. Second and alternatively is whether the Spin–Off, as consummation of the financial restructuring of Integra, constituted a settlement payment. The third is whether the delivery of stock certificates to First Chicago and its subsequent delivery to American Transtech for mailing and the crediting and distribution by DTC satisfies the settlement payment "made by or to" a financial institution or securities clearing agency.

▮▮▮ With respect to whether the Spin–Off alone constituted a settlement payment the Court notes that this transfer had several distinguishable characteristics from the Kaiser LBO. First, in Kaiser the shareholders had to approve the LBO. In the case at hand, the Spin–Off apparently was decided without a vote of the shareholders. In fact, the shareholders did not take any action to effectuate the exchange of shares. Second, in Kaiser the common stock shareholders received a monetary payment plus preferred stock in the new Kaiser entity. In this case, the shareholders' common stock interest in a hotel and restaurant business was divided

---

**2.** The SEC's brief in *Schwab* at p. 30, n. 33 differentiated settlement payments from dividends:

> The LBO payments were made in exchange for stock pursuant to the terms of a merger that required shareholder approval. **Dividends, in contrast, do not involve an exchange and are declared by directors. Thus, dividends would not fall within the definition of 'settlement payment' for purposes of Section 546(e).** Emphasis added.

The Court notes that the SEC is an objective party best situated to explain industry practice.

**3.** The same Group of Thirty defines "post-settlement functions" as "[a]dministrative functions connected with safe keeping securities, such as dividend payments; stock dividend, warrant, and bonus share processing; notification of warrants, rights and tender offers; and other corporate actions." Group of Thirty Report at 85. *The post-settlement functions require nothing of the shareholders to effectuate the transaction.*

into a common stock interest in a hotel business and an interest in a restaurant business without the receipt of any money or any change in what was owned. Furthermore, for income tax purposes, Integra treated the transfer as a tax-free distribution. Based upon those differences, the Court is not persuaded that the Spin–Off should be treated the same way as a LBO transaction.

While the Court agrees that settlement payment is to be interpreted broadly, as stated by Judge Kane, "it is not boundless". This transaction was treated by Integra as a distribution of dividends. Looking at the transaction itself, it was, as the Trust called it, a transmogrification of the shares. There was not really an exchange, and certainly, no consideration was given by the recipients for the exchange. The Court is not inclined to treat any delivery of stock to complete a distribution as a settlement payment. Had that been the intent of Congress, it could have stated that a trustee could not avoid any securities transfer or transaction including dividends made to or by a financial institution or clearing house whether or not an exchange of money and securities is involved as in a settlement payment.[4]

The Court is not persuaded by the Fund's public policy arguments that 1) undoing this type of transaction will have a ripple effect on the market, 2) creditors had an ample opportunity to challenge the transfer and 3) any damages claims should have been pursued against Hallwood and its nominees.[5] First, there is no risk for the clearing houses that served as administrative functionaries. As for potential disruption to defendants who used the shares as collateral, etc., it is unfortunate and extraneous to the proceeding before the Court, except to note that they had been forewarned that the transfer may be undone as a fraudulent one. Thus, defendants and financial institutions were in a better position than creditors to evaluate the risks of the transfer.

The Fund argues in the alternative that the Court should examine the entire corporate restructuring as the settlement payment. It claims that the distribution completed the contractual requirements for the Spin–Off and corporate restructuring measures including the offering and issuance of other securities which would need to be unscrambled if avoided.

The Court is not persuaded that considering all of the restructuring transactions changes the analysis. The debtor's property was transferred or distributed to its shareholders without any shareholder action or consideration. Looking at the entire restructuring process does not change the transfer into a settlement payment.

## II. Determination of the Applicable Statute of Limitations for the Fraudulent Transfer Claims

Additional facts related to whether the Texas or Delaware statute of limitations applies are:

1. Integra's corporate operations were conducted out of Texas. The corporate headquarters were in Irving, Texas.

2. ShowBiz' headquarters was located in the same building.

3. Both companies maintained their corporate records at those headquarters.

4. The Unanimous Consents in lieu of Meetings of the Integra Board of Directors were prepared at the Texas corporate offices. They were signed there by the directors who lived in Texas and mailed or faxed to other directors, none of whom lived in Delaware.

5. The July 1988 Agreement was signed in Texas by Integra's Senior Vice President and General Counsel.

6. The transfer was considered by the Integra directors in the October 1988 meeting held in Dallas.

---

**4.** In the Final Report of the Securities and Exchange Commission on the Practice of Recording the Ownership of Securities in the Records of the Issuer in other than the Name of the Beneficial Owner of Such Securities, pursuant to Section 12(m) of the Securities Exchange Act of 1934 at 9, n. 1 (December 3, 1976), the SEC stated: "Clearance and settlement of securities transac-

tions encompasses the process by which parties to a transaction exchange money and securities."

**5.** The claims, if any, against Hallwood and its nominees appear to have been settled. Hence, there is no additional recovery from that source.

7. The closing for the July 1988 Agreement was held at the Dallas offices of the law firm of Stinson Mag & Fizzel.

8. At least 23 of the allowed claims aggregating in excess of $23 million, arose prior to the transfer.

9. Texas was home to 3% of Integra's shareholders. Located in Texas and owned by Integra were 17 ShowBiz restaurants, 4 Chuck E. Cheeses and 51 Monterey House restaurants. In July of 1988, Integra did not have any ShowBiz, Chuck E. Cheese or Monterey House restaurants in Delaware.

10. In 1988, Integra owned three hotels in Texas, but none in Delaware.

11. Texas is where 7% of Integra's creditors reside. Forty-eight of the allowed unsecured claimants reside there. The 48 claimants hold over $10 million or 20% of the allowed claims. No allowed unsecured claimants reside in Delaware.

12. At the time of the Spin–Off, no more than 11 common and preferred shareholders' accounts (representing 828 shares) were located in Delaware, but 30 times that many (344 accounts holding 53,742 shares) were located in Texas.

The determination of the applicable state fraudulent transfer law and corresponding statute of limitations period is critical. Delaware has a three year statute of limitations to bring fraudulent conveyance actions; the Texas statute of limitations is four years. Since the bankruptcy petition was filed on July 14, 1992, any fraudulent conveyance claims arising before July 13, 1989 would be barred under Delaware law.

The Fund argues that under the *Restatement (Second) of Conflict of Laws (Restatement )*, Section 302, the challenge of a corporate act generally should look to the state of incorporation for governing law.

The Trust maintains that Section 301 of the *Restatement* requires that a transfer in fraud of creditors should be determined by the law of the state with the most significant relationship to the matter. The Trust asserts that Texas has the most significant relationship. Moreover, it contends that under any analysis, Texas law governs.

■ The analysis of choice of law issues begins with the application of the conflict of law rules of the forum state, Colorado. *See In re Kaiser Steel Corp.*, 87 B.R. 154 (Bankr. D.Colo.1988). The parties dispute whether the Court should consider *Restatement* Section 301 or 302 to determine which law to apply.

*Restatement* Section 301 provides:

**Rights Against and Liabilities to Third Person.**

The rights and liabilities of a corporation with respect to a third person that arise from a corporate act of a sort that can likewise be done by an individual are determined by the same choice-of-law principles as are applicable to non-corporate parties.

Comment b to Section 301 states in relevant part: "The choice-of-law rule applied to determine whether a transfer is in fraud of creditors will also be the same whether the transfer was made by a corporation or by an individual."

*Restatement* Section 302 provides:

**Other Issues with Respect to Powers and Liabilities of a Corporation.**

(1) Issues involving the rights and liabilities of a corporation, other than those dealt with in Section 301, are determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties under the principles stated in Section 6.[6]

---

**6.** The relevant portion of Section 6 lists the following non-inclusive factors to select the applicable rule of law:

    (a) the needs of the interstate and international systems,

    (b) the relevant policies of the forum,

    (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

    (d) the protection of justified expectations,

    (e) the basic policies underlying the particular field of law,

    (f) certainty, predictability and uniformity of result, and

    (g) ease in the determination and application of the law to be applied.

(2) The local law of the state of incorporation will be applied to determine such issues, except in the unusual case where, with respect to the particular issue, some other state has a more significant relationship to the occurrence and the parties, in which event the local law of the other state will be applied.

The comments to Section 302 are helpful. Comment b notes that the rule is based on:

the needs of the interstate and international systems, certainty, predictability and uniformity of result, protection of the justified expectations of the parties, implementation of the relevant policies of the state with the dominant interest in the decision of the particular issue and ease in the application of the law to be applied.

Comment e observes that with respect to the operation and effect of a dividend declaration, the state of incorporation will usually have the dominant interest in these issues, and applying its law will protect the reasonable expectations and promote ease in the administration of law. It further explains, "[u]niform treatment of directors, officers and shareholders is an important objective which can only be attained by having the rights and liabilities of those persons with respect to the corporation governed by a single law."

Comment g notes that "where the corporation has little contact with there state of incorporation, application of the local law of another state is more easily justified."

The Court agrees that Section 302 applies to resolve the conflict of law argument. The question is whether these facts present an exception to applying the law of the state of incorporation because another state has a more significant relationship to the occurrence and the parties.

Here, the transfer attacked is a distribution which is allegedly fraudulent and an unlawful dividend. Section 302 applies since this type of transfer cannot be done by an individual, as only a corporation can issue a stock dividend. Nevertheless, both subsection (2) to Section 302 and comment g recognize that there will be instances where the corporation has little contact with the state of incorporation and another state has the most significant relationship to the occurrence and the parties. Cf., *Loveridge v. Dreagoux,* 678 F.2d 870, 878 (10th Cir.1992) ("[w]e are not unaware of the rule that the internal affairs of the corporation, such as the relationship of the officers and directors to the corporation, are governed by the state of incorporation ... In this case, the validity of the corporation arises in the context of fraud and misrepresentations made to third parties. Thus, it was not an internal matter."). Furthermore, although the transfer involved the alleged issuance of a dividend, which appears to be a corporate act, that appearance is shattered to the extent that it was used as a device to effectuate a fraudulent conveyance. Hence, the Court will determine whether Delaware or Texas has the most significant relationship to this occurrence and the parties.

In *Kaiser,* 87 B.R. 154, Judge Matheson looked at several factors to determine the most significant relationship. He looked at where the transactions related to the LBO occurred or originated; where the underlying transactions were approved; where the distributions were made or from where they were directed; the principal place of business; where a significant number of creditors affected by the transfers were located; whether there was an allegation of a single contact with Colorado at the time of the LBO. 87 B.R. at 159–160.

■ Applying those considerations here, the Court finds the law of Texas should be applied. The entire transfer originated from Texas. The transfer was approved by directors in Texas and otherwise was derivative of actions taken in Texas. The distribution was directed from Texas. Integra's principal place of business was Texas. A significant number of the creditors affected by the transfer were located in Texas. A significant number of shareholders receiving the distribution were located in Texas. An incorporation certificate and a few shareholders constituted the debtor's only contact with Delaware at the time of the transfer. Therefore, the substantive law of Texas applies to the fraudulent transfer claims. Because the four-year statute of limitation period had not

expired at the time Integra filed for bankruptcy, the fraudulent transfer claims are not barred.

■ *Although this Court believes Texas law should be applied, even if Delaware law applied, the limitations period would not have run for those creditors who extended credit after the transfer and within three years before the ˙ bankruptcy petition was filed. The Delaware Fraudulent Conveyance Act provides that fraudulent transfers may be set aside by creditors who extend credit after the date of the transfer.* 6 Del.C. §§ 1305, 1306 and 1307.[7]

The Fund urges the Court to follow *Kupetz v. Wolf,* 845 F.2d 842 (9th Cir.1988), to bar the post-transfer creditors' claims. *Kupetz* held that notwithstanding the language in the fraudulent conveyance statute, post-transfer creditors with actual or constructive knowledge of a transaction cannot later complaint of its effects. *Kupetz* involved an LBO transaction.

The Court agrees with those courts which have criticized the reasoning of *Kupetz. See Bay Plastics Inc. v. BT Commercial Corp. (In re Bay Plastics, Inc.),* 187 B.R. 315, 327 (Bankr.D.Cal.1995). Certainly *Kupetz* does not apply to creditors who did not voluntarily extend credit to the debtor, such as taxing authorities who cannot in the ordinary course of business evaluate the financial condition of the debtor before extending credit. Furthermore, the Court does not find that the statements about the transfer in the *Wall St. Journal* were sufficient to impute knowledge to trade creditors. While the post-transfer creditors could have done evaluation of the financial condition of the debtor before extending credit, in the ordinary course of business for small trade creditors, that is not done. Therefore, even if the Delaware statute of limitations applies, the Court will not follow the *Kupetz* exception regarding knowledge and instead will apply the plain language of the statute which allows the post-transfer creditors to be protected from the conveyance.

## III. Determination of Unlawful Dividend Recovery from Shareholders

■ As a preliminary matter, the Court must determine whether Delaware law should apply to the issue of dividend recovery. The Restatement incorporates a selective, "issue-by-issue approach to determining choice of law." *Johnson v. Continental Airlines Corp.,* 964 F.2d 1059, 1063 (10th Cir. 1992). For example, the court in *In re Revco D.S., Inc.,* 118 B.R. 468, 501–504 (Bankr. N.D.Ohio 1990), relied upon a recommendations by a court-appointed examiner which concluded that the law of the state of incorporation governed the improper dividend claims and the law of Ohio governed the fraudulent conveyance claims. *See also, Geren v. Quantum Chemical Corp.,* 832 F.Supp. 728 (S.D.N.Y.1993) (court applied New York fraudulent conveyance law to fraudulent conveyance claim and Virginia law to unlawful dividend claim arising out of a Virginia corporation's payment of a dividend); and *In re Sunshine Precious Metals, Inc.,* 157 B.R. 159 (Bankr.D.Idaho 1993) (court applied Texas Fraudulent Transfer Act to fraudulent transfer claim and Delaware law to an unlawful dividend claim arising out of a Delaware corporation's transfer of assets to its sole shareholder).

---

7. 6 Del.C. § 1305 provides:

Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and *as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.*

Emphasis added.

6 Del.C. § 1306 provides:

Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, *is fraudulent as to both* present and *future creditors.*

Emphasis added.

6 Del.C. § 1307 provides:

Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, is fraudulent *as to both* present and *future creditors.*

Emphasis added.

■ Here, the Court finds that the alleged improper payment of dividends is governed by the state of incorporation, Delaware. While the Court concedes that the cases which applied one state's law for the fraudulent conveyance issue and the other state's law to the unlawful dividend did not discuss the conflict of law issue, the result was appropriate. Unlike the fraudulent transfer of corporate assets through the vehicle of a dividend which focuses, *inter alia*, on consideration for the transfer, the question of unlawful dividends relates directly to the administration of corporate affairs. Without a demonstration that some other jurisdiction has a more significant relationship to the administration of corporate affairs, the law of the state of incorporation would govern the resolution of the unlawful dividend issue.[8]

■ The Trust relies upon 8 Del. C.Ann. § 174(c) and the case of *In re Kettle Fried Chicken of America, Inc.*, 513 F.2d 807 (6th Cir.1975), to support the claim that unlawful dividends may be recovered from Shareholders.

The Fund contends that Section 174(c) does not create a corporate right of action against shareholders. Moreover, if it did create some right, it exists only against a shareholder with knowledge of facts indicating that the dividend was unlawful. The Fund asserts that the Trust did not allege such knowledge and that therefore this claim should be denied.[9] Finally, it argues that any common law right of action against shareholders has been exercised by courts only when the corporation distributed substantially all of its assets to its shareholders leaving corporate creditors with nothing.

The applicable Delaware statute, Section 174(c) provides:

> Any director against whom a claim is successfully asserted under this section shall be entitled, to the extent of the amount paid by him as a result of such claim, to be subrogated to the rights of the corporation against stockholders who received the dividend on, or assets for the sale or redemption of, their stock *with knowledge of facts indicating that such dividend, stock purchase or redemption was unlawful* under this chapter, in proportion to the amounts received by such stockholders respectively.[10]

Emphasis added.

The case of *In re Kettle Fried Chicken of America, Inc., supra* involved the recovery of the money paid by the corporation to repurchase stock from five shareholders, two of which were clearly insiders. The shareholders were found liable to the corporation. The court determined that the legislature in providing a specific remedy against directors did not intend to relieve shareholders of liability. The court quotes persuasive language from a case which stated: "The stockholder who has received part of the capital by way of dividend, without legislative authority, has

---

8. Support for this conclusion is also provided by several sections from the *Restatement.* Section 304 explains:

> [t]he local law of the state of incorporation will be applied to determine the right of a shareholder to participate ... in the division of profits ... and his rights on the issuance of new shares, except in the unusual case where, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the shareholder and the corporation, in which event the local law of the other state will be applied.

> In addition, Section 307 states that "[t]he local law of the state of incorporation will be applied to determine the existence and extent of a shareholder's liability to the corporation ... and to its creditors for corporate debts."

9. The Fund points out that the reports of Integra's surplus level demonstrate the dividend was lawful.

10. Section 174(a) provides for liability as follows:

> In case of any wilful or negligent violation of § 160 or 173 of this title, the directors under whose administration the same may happen shall be jointly and severally liable, at any time within 6 years after paying such unlawful dividend or after such unlawful stock purchase or redemption, to the full amount of the dividend unlawfully paid, or to the full amount unlawfully paid for the purchase or redemption of the corporation's stock, with interest from the time such liability accrued. Any director who may have been absent when the same was done, or who may have dissented from the act or resolution by which the same was done, may exonerate himself from such liability by causing his dissent to be entered on the books containing the minutes of the proceedings of the directors at the time the same was done or immediately after he has notice of the same.

no right to it as against the creditors of the corporation, and no wrong is done him if he be compelled to repay it when it is required to pay the debts of the corporation." (citation omitted).

There do not appear to be cases directly on point for a situation such as the one at hand where a distribution has been made by a large publicly-held corporation. Nevertheless, the Court is persuaded that a corporate right of action would exist against any shareholder who knowingly received an unlawful dividend. *See generally, In re Kettle Fried Chicken of America, Inc.*, 513 F.2d 807 (6th Cir.1975); *Resolution Trust Corp. v. Dean*, 854 F.Supp. 626, 651 (D.Ariz.1994); *Lippi v. City Bank*, 955 F.2d 599, 609 (9th Cir.1992).

The Court is not persuaded that the courts mentioned in the preceding paragraph properly considered the "knowledge" that the shareholder must have under the statute.[11] The language of Section 174(c) requires knowledge that the dividend was unlawful. At this juncture in the present case, the "knowledge" issue and the extent of the shareholders' knowledge that the dividend was allegedly unlawful is subject to dispute and will not be resolved by way of dispositive motion.

Based upon the preceding, it is hereby

ORDERED that the Fund's request that the Court determine the transfer of ShowBiz shares was a settlement payment is denied.

ORDERED that the Fund's request for a determination that the fraudulent transfer claims are barred by the Delaware statute of limitations is denied; the Texas statute of limitations will be applied.

ORDERED that the Fund's request that the Court determine that unlawful dividends may not be recovered from shareholders under Delaware law is denied.

---

**11.** In *Kettle*, The court rationalizes that in a stock repurchase, it does not matter whether the shareholders knew of the illegal act. It went on to state that the purchase of its own stock by a corporation is in no sense comparable to the declaration of a corporate dividend. Therefore, with respect to the knowledge question, the *Kettle* case is neither legally nor factually apposite.